[No. 23030-5-II. Division Two. March 19, 1999.]
THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant*, v. STANLEY B. KANTOR, D.O., *Respondent*.

766

*Christine O. Gregoire, Attorney General,* and *R. Steven Puz, Assistant,* for appellant.

*John W. Schedler,* for respondent.

SEINFELD, J. — This case requires us to construe RCW 51.48.260, which allows the Department of Labor and Industries (L&I) to recover "any excess payments" it has made to a health care provider. We hold that the term "excess payments" includes payments that L&I previously made for services that were not "medically necessary." We further hold that the statute authorizes L&I to suspend a health care provider's eligibility to treat covered workers and to condition reinstatement upon successful completion of continuing medical education courses.

## FACTS

Stanley Kantor, D.O., was the subject of an L&I audit. L&I reviewed his treatment records for 23 covered work-

ers[1] and his billings for their treatment for the period of May 10, 1987 through May 9, 1990. L&I found that Kantor had violated the standard of care for osteopathic physicians and had placed covered workers at risk by: (1) providing unnecessary osteopathic manipulations; (2) maintaining inadequate documentation; (3) inappropriately dispensing prescription and nonprescription drugs; and (4) failing to maintain adequate treatment plans. Further, L&I found it had paid Kantor for services in violation of the Washington Administrative Code.

Although the record before us contains evidence regarding Kantor's treatment of all 23 patients whose records were subject to the audit, the Board of Industrial Insurance Appeals made findings only as to the following six patients: G1, N, S1, T, S2, and G2.[2]

Patient G1: Kantor treated patient G1 238 times during the audit period, approximately once every three or four days, and he billed L&I for 701 items of service. Kantor had treated G1 for a previous industrial injury but did not report this fact to L&I. He continued treating G1 after being advised by an orthopedic surgeon that such treatment would have no curative effect although G1 apparently suffered from chronic pain behavior.[3] A reviewing physician found that Kantor kept inadequate records of G1's treatment, putting G1 at risk of misdiagnosis, injury, or death if treated by a physician unfamiliar with G1's medical history.

Patient N: Kantor prescribed narcotics to patient N with knowledge that N combined the narcotics with alcohol and other medication. The reviewing physicians concluded that Kantor's inadequate documentation and prescription practice created a very high risk of adverse health consequences or death to N.

---

[1]"Covered workers" refers to injured workers eligible for coverage under the Industrial Insurance Act, RCW 51.

[2]We refer to the patients by their initials to protect their privacy.

[3]Chronic pain behavior is a condition not unlike drug addiction where a patient who has had prolonged osteopathic treatment comes to believe that he or she cannot function without continued treatment.

Patient S1: Kantor prescribed narcotics to patient S1, who Kantor knew had a 15-year history of heroin addiction and who exhibited drug-seeking behavior during the course of his treatment. Kantor did not record his prescriptions in several instances. The reviewing physicians found that Kantor's prescription practice and lack of documentation subjected S1 to a high risk of adverse health consequences.

Patient T: Kantor prescribed medications to patient T that could intensify her depression and retard her psychomotor function, although T's objective findings did not justify these prescriptions. Again, Kantor failed to record a number of prescriptions in T's records, and when T complained that the narcotic Darvocet was having no effect, Kantor prescribed a stronger narcotic without explaining in T's file why the stronger medication was necessary. Kantor continued to prescribe Darvocet approximately 95 times over the next two years without any explanation. And according to a reviewing physician, Kantor's prescription practice and lack of record keeping put T at a high risk of adverse health consequences.

Patient S2: Kantor prescribed narcotics and opiates to patient S2, who suffered chronic pain from a back injury, along with iron deficiency anemia and esophagitis—an erosion of the esophagus. These medications carry an unacceptably high risk of triggering side-effects and complications such as "[p]hysical habituation, addiction, impairment of psychomotor function, triggering or worsening of depression, which is very common in patients with chronic pain, and operant reinforcement of chronic pain . . . ." The medication also could aggravate esophagitis, leading to greater blood loss, which could in turn worsen the anemia. Although Kantor knew that S2 consumed "mild to moderate" amounts of alcohol, he nonetheless prescribed these medications, thereby putting S2 at risk of further impairment. And again a reviewing physician concluded that Kantor's prescription practice for this patient did not conform to the accepted standards of good practice.

Patient G2: In 1989, Kantor began treating patient G2

for pain arising from an industrial injury. Kantor's file for G2 contained an incomplete patient registration form, and the treatment notes were "woefully lacking in subjective and objective findings." Another physician who examined G2 in 1990 found that G2 tended to exaggerate her symptoms and that the objective clinical examination findings did not support G2's pain responses. A reviewing physician said that Kantor's treatment of G2 over a two-year period was not medically necessary, concluding that Kantor had rendered treatment that was neither curative nor rehabilitative. He said that the treatment "had no impact on the patient's outcome whatsoever," and further

> [t]he patient continued to have the same complaints and the same findings month after month. He was treating the patient wrongly. If she had functional problems or behavioral problems or psychological problems, the focus of his treatment should have been in those areas, not OMT.[4]

Following its audit, L&I (1) suspended Kantor as a service provider for covered workers for not less than one year; and, (2) as preconditions to reinstatement, required Kantor to (a) refund the $63,231.24 plus interest L&I had paid him for improper and unnecessary medical treatment and (b) complete 132 hours of L&I approved continuing medical education. The Board of Industrial Insurance Appeals affirmed the suspension and continuing medical education requirement, but concluded that L&I did not have authority to order Kantor to refund the payments.

Both parties appealed to the superior court. The superior court concluded that L&I: (1) lacked authority to require Kantor to refund payments; but (2) had the authority (a) to conduct an audit to determine if Kantor's treatment of covered workers violated the standard of care for osteopathic physicians, (b) to sanction Kantor by suspending his provider number, and (c) to condition his reinstatement upon his completion of 132 hours of continuing medical training. It also found proof that in the above six cases,

---

[4]OMT is an acronym for osteopathic manipulation.

Kantor had violated the standard of care for osteopathic physicians.

L&I appeals, arguing that it has statutory authority to order the refund. Kantor cross-appeals, arguing that only the Board of Osteopathic Medicine and Surgery, not L&I, has authority to determine whether he violated accepted standards of good practice for osteopathic surgeons and to sanction or suspend him from treating covered patients.

## DISCUSSION

We apply the error of law and substantial evidence standards when reviewing an agency order. RCW 34.05-.570(3)(d), (e); *see Hamel v. Employment Sec. Dep't*, 93 Wn. App. 140, 144, 966 P.2d 1282 (1998). On issues of law, this court may substitute its judgment for that of the agency; however, we accord great weight to the agency's view of the law it administers. *Hamel*, 93 Wn. App. at 144-45; *Valentine v. Department of Licensing*, 77 Wn. App. 838, 844, 894 P.2d 1352 (1995). On mixed questions of law and fact, we determine the law independently and then apply it to the facts as the agency has found them. *Hamel*, 93 Wn. App. at 145; *Valentine*, 77 Wn. App. at 845. Because neither L&I nor Kantor assign error to the trial court's findings of fact, the findings are verities on appeal. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

## I. MEDICAL PAYMENTS

The Industrial Insurance Act, RCW 51, requires the director of L&I to "[s]upervise the medical, surgical, and hospital treatment to the intent that it may be in all cases efficient and up to the recognized standard of modern surgery." RCW 51.04.020(4). The Act further requires the director to "supervise the providing of prompt and efficient care and treatment . . . to workers injured during the course of their employment at the least cost consistent with promptness and efficiency," RCW 51.04.030(1), and to implement a fee schedule of services for covered workers, RCW 51.04.030(2).

Pursuant to the foregoing statutes, L&I promulgated "medical aid rules," WAC 296-20, with which "[p]hysicians examining or attending injured workers" under the Act must comply, RCW 51.36.060. All fees for services provided to covered workers must comply with L&I regulations. RCW 51.36.080, .085. A physician's treatment of a worker eligible for coverage "constitutes acceptance of the department's medical aid rules and compliance with its rules and fees." WAC 296-20-020.

The medical aid rules require practitioners to bill and the department to pay "only for proper and necessary medical care required for the diagnosis and curative or rehabilitative treatment of the accepted condition." WAC 296-20--010(8). "Medically necessary" is defined in WAC 296-20--01002, which states in relevant part:

> Those health services are medically necessary which, in the opinion of the director or her designee, are:
>
> (a) Proper and necessary for the diagnosis and curative or rehabilitative treatment of an accepted condition; and
>
> (b) Reflective of accepted standards of good practice within the scope of the provider's license or certification; and
>
> (c) Not delivered primarily for the convenience of the claimant, the claimant's attending doctor, or any other provider[.]

The Act also authorizes L&I to audit "all records in connection with the provision" of medical services. RCW 51.36.100. If a health care provider, acting without intent to violate the Act, "obtains payments" to which he or she is not "entitled," the provider is liable for "any excess payments received" and any applicable interest on such excess payments. RCW 51.48.260;[5] *see also* WAC 296-20-015(5)(a). L&I may also terminate or suspend a health care provider's

---

[5]RCW 51.48.260 states:

Any person, firm, corporation, partnership, association, agency, institution, or other legal entity, but not including industrially injured recipient of health services, that, without intent to violate this chapter, obtains payment under Title 51 RCW to which such person or entity is not entitled, shall be liable for: (1) Any excess payments received; and (2) interest on the amount of excess

eligibility to furnish services to covered workers. RCW 51.36.110.[6]

Here, there is no indication that Kantor billed for fictitious treatment or otherwise violated billing procedures. And L&I approved and paid for the treatments that it later determined were unnecessary. But the undisputed evidence of Kantor's unnecessary osteopathic manipulations, hazardous medical prescriptions, and shoddy records support the conclusion that he provided treatment that was not proper and necessary for the diagnosis and curative rehabilitation of these patients' injuries and was not reflective of accepted standards of good practice for osteopathic surgeons. WAC 296-20-01002. Thus, the question before us is whether RCW 51.48.260 authorizes L&I, under these circumstances, to recover "excess" payments.

The construction of a statute is a question of law subject to de novo review. *Rettkowski v. Department of Ecology*, 128 Wn.2d 508, 515, 910 P.2d 462 (1996); *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 627, 869 P.2d 1034 (1994). In determining the scope of a statute, we first look to the relevant statutory language. *Everett Concrete Prods., Inc. v. Department of Labor & Indus.*, 109 Wn.2d 819, 821, 748 P.2d 1112 (1988); *Superior Asphalt & Concrete Co. v. Department of Labor & Indus.*, 84 Wn. App. 401, 406, 929 P.2d 1120 (1996). If the statute is clear and unambiguous on its face,

---

payments at the rate of one percent each month for the period from the date upon which payment was made to the date upon which repayment is made to the state.

[6]In relevant part, RCW 51.36.110 states:

The director of the department of labor and industries or the director's authorized representative shall have the authority to:

(1) Conduct audits and investigations of providers of medical, chiropractic, dental, vocational, and other health services furnished to industrially injured workers pursuant to Title 51 RCW. . . .

(2) Approve or deny applications to participate as a provider of services furnished to industrially injured workers pursuant to Title 51 RCW; and

(3) Terminate or suspend eligibility to participate as a provider of services furnished to industrially injured workers pursuant to Title 51 RCW.

we need not resort to methods of statutory construction. *Rettkowski*, 128 Wn.2d at 515; *State v. Kazeck*, 90 Wn. App. 830, 833, 953 P.2d 832 (1998); *State v. McCollum*, 88 Wn. App. 977, 988, 947 P.2d 1235 (1997). But if a statute is susceptible of two or more reasonable interpretations, we will engage in statutory construction. *Washington Pub. Employees Ass'n v. Washington Personnel Resources Bd.*, 91 Wn. App. 640, 652, 959 P.2d 143 (1998); *see also State v. Ollens*, 89 Wn. App. 437, 442, 949 P.2d 407 (1998).

■ ■ We construe a statute to ascertain and give effect to legislative intent. *City of Redmond v. Central Puget Sound Growth Management Hearings Bd.*, 136 Wn.2d 38, 52, 959 P.2d 1091 (1998); *Washington Pub. Employees Ass'n*, 91 Wn. App. at 652. We also construe statutes as a whole, trying to give effect to all the language and to harmonize all provisions. *City of Seattle v. Fontanilla*, 128 Wn.2d 492, 498, 909 P.2d 1294 (1996); *Washington Pub. Employees Ass'n*, 91 Wn. App. at 652.

RCW 51.48.250 makes a medical service provider liable for payments to which it "is not entitled." Kantor agrees that L&I could have refused to pay his bill initially, but he contends that once L&I approves and pays a bill, it loses the ability to demand repayment on the basis that the services were medically unnecessary. L&I argues that Kantor was not "entitled" to payment and, thus, it has statutory authority to seek repayment.

■ Neither the Industrial Insurance Act, the medical aid rules, nor case law defines "entitled" as that term is used in RCW 51.48.260. Nor does the legislative history provide guidance. Thus, we resort to extrinsic aids, such as dictionaries, to find the word's ordinary meaning. *Brenner v. Leake*, 46 Wn. App. 852, 854-55, 732 P.2d 1031 (1987).

■ A legal definition of "entitle" is "to give a right or legal title to" something. BLACK'S LAW DICTIONARY 477 (5th ed. 1979). A more common meaning is to "furnish with proper grounds for seeking or claiming something." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 758 (3d ed. 1969).

Here, Kantor did not have a legal right to payment for medically unnecessary treatment. Further, he had not furnished L&I with proper grounds for payment.

 A corollary to the Act's provision that a covered worker is entitled to proper and necessary treatment is that a health care provider is entitled to payment *only if* he gives proper and necessary treatment. RCW 51.36.010. Thus, to be eligible for payment, the health care provider must provide and bill L&I for proper and necessary treatment only. RCW 51.36.060; WAC 296-20-010(8), -01002.[7] And the audit authorized by RCW 51.36.100 provides the basis for L&I to take "corrective action," including suspension or termination of the right to give treatment to covered workers, WAC 296-20-02010; RCW 51.36.110(3); WAC 296-20-015(4); imposition of conditions or limitations on the right to render treatment, WAC 296-20-015(4); recoupment of payments made to the provider, together with interest, WAC 296-20-015(5)(a); and completion of remedial education courses, WAC 296-20-015(5)(e).[8]

---

[7]WAC 296-20-01002, medically necessary, states in relevant part:

Those health services are medically necessary which, in the opinion of the director or his or her designee, are:

(a) Proper and necessary for the diagnosis and curative or rehabilitative treatment of an accepted condition; and

(b) Reflective of accepted standards of good practice within the scope of the provider's license or certification; and

(c) Not delivered primarily for the convenience of the claimant, the claimant's attending doctor, or any other provider; and

(d) Provided at the least cost and in the least intensive setting of care consistent with the other provisions of this definition.

In no case shall services which are inappropriate to the accepted condition or which present hazards in excess of the expected medical benefits be considered medically necessary.

[8]WAC 296-20-015(5) states:

If the department finds reason to take corrective action, the department may also order one or more of the following:

(a) Recoupment of payments made to the provider, including interest; (Chapter 51.04 RCW.)

██ ██ Because the Act authorized Kantor to bill L&I for proper and necessary treatment only, Kantor's bill for medically unnecessary treatment did not provide "proper grounds" for or a "right or legal title" to payment by L&I. Because Kantor was not "entitled" to receive payment for improper treatment, he is liable to L&I for those monies as "excess" payments.[9] RCW 51.48.260; WAC 296-20-105-(5)(a).

Further, Kantor's strained interpretation of RCW 51.48.260, as authorizing recoupment only when L&I has mistakenly paid for workers who were ineligible for coverage, is not persuasive. *See State v. Riles*, 135 Wn.2d 326, 340, 957 P.2d 655 (1998) (we must avoid strained or absurd interpretations of a statute). RCW 51.48.260 clearly does not address worker eligibility, but rather focuses on the repayment of funds to which the payee was not entitled.[10] Because Kantor is a payee of funds to which he was not entitled, the statute authorized L&I to demand a refund. RCW 51.48.260.

This interpretation of RCW 51.48.260 supports the Act's policy of promoting the efficient, prompt payment of claims.

(b) Denial or reduction of payment;

(c) Assessment of penalties for each action that falls within the scope of subsection (4) (a) through (q) of this section; (Chapter 51.48 RCW.)

(d) Placement of the provider on a prepayment review status requiring the submission of supporting documents prior to payment;

(e) Requirement to satisfactorily complete remedial education courses and/or programs; and

(f) Imposition of other appropriate restrictions or conditions on the provider's privilege to be reimbursed for treating workers under the Industrial Insurance Act.

[9] We also note that "excess" is an undefined term. According to the common dictionary definition, "excess" is a "state of surpassing or going beyond limits" or "more than or above the usual or specified amount." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 792 (3d ed. 1969). As Kantor was limited to payments to which he was entitled only, and he was entitled only to payment for proper and necessary medical treatment, payments for improper and unnecessary treatment are "excess" under RCW 51.48.260.

[10] We note that RCW 51.32.240 allows L&I to recoup disability payments made to injured workers due to error, mistake, erroneous adjudication and fraud. *See Weyerhaeuser Co. v. Bradshaw*, 82 Wn. App. 277, 918 P.2d 933 (1996).

RCW 51.04.030. L&I processes more than 180,000 claims annually. *Kingery v. Department of Labor & Indus.*, 132 Wn.2d 162, 169, 937 P.2d 565 (1997). L&I must pay a claim for medical services within 60 days of receipt of billing to avoid paying interest on the unpaid claim. RCW 51.36.080.

Given this volume and short timeline, it is not reasonable to expect L&I to analyze the medical merits of every claim before payment. The Act's auditing provisions, RCW 51.36.100 and RCW 51.36.110, allow for postpayment evaluation of the necessity of medical treatment. And RCW 51.48.260 allows L&I to recoup payments where the payee was not "entitled" to payment.

We note that the trial court entered findings as to only six patients but L&I seeks reimbursement for payments related to all 23 workers who were subject to the audit. On remand, we direct the trial court to determine to what extent each of the 23 workers received improper and unnecessary medical treatment and the amount of payments subject to recoupment.

## II. L&I's AUTHORITY TO IMPOSE CONDITIONS

■■■ Kantor claims that L&I acted ultra vires and violated his due process rights by (1) failing to obtain recommendations from the Washington State Medical Association's Medical Advisory and Utilization Review Committee to the Department of Labor and Industries (Medical Advisory Committee) before entering its orders, (2) ordering him to attend continuing medical education courses as a prerequisite to reacquiring his provider number, and (3) determining that he had violated the standard of care for osteopathic physicians. But Kantor fails to cite to any provision of either the Washington or United States Constitution to support his due process claim. RAP 10.3(a)(5); *see also In re Marriage of Olson*, 69 Wn. App. 621, 625, 850 P.2d 527 (1993) (failure to adequately set forth constitutional argument precludes review). In any event, these claims are unpersuasive on the merits.

■■■ "Ultra vires acts are those done 'wholly without

legal authorization or in direct violation of existing statutes
. . . .' " *Metropolitan Park Dist. v. Department of Natural Resources*, 85 Wn.2d 821, 825, 539 P.2d 854 (1975) (quoting *Finch v. Matthews*, 74 Wn.2d 161, 172, 443 P.2d 833 (1968)). "The power and authority of an administrative agency is limited to that which is expressly granted by statute or necessarily implied therein." *McGuire v. State*, 58 Wn. App. 195, 198, 791 P.2d 929 (1990); *see also McGovern v. Department of Soc. & Health Servs.*, 94 Wn.2d 448, 450, 617 P.2d 434 (1980).

### Medical Advisory Committee

 Citing WAC 296-20-020, Kantor argues that L&I acted ultra vires when it sanctioned him on the basis of the quality of his medical care without first obtaining a recommendation from the Medical Advisory Committee.[11]

L&I's regulations provide for a Medical Advisory Committee composed of nine members, one of whom is an osteopathic physician. WAC 296-20-01001(1). The purpose of the committee is to function

> as an advisor to the department with respect to policies affecting medical care and rehabilitation, quality control and supervision of medical care, and the establishment of rules and regulations. It shall also advise and assist the department in the resolution of controversies, disputes and problems between the department and the providers of medical care.

WAC 296-20-01001(2). "Cases in which there is a question of medical ethics or quality of medical care, will be referred to . . . [the Medical Advisory Committee] . . . for recommendations." WAC 296-20-020.

When an agency's enabling act does not provide for a

---

[11]Kantor has failed to provide a record citation demonstrating that the Medical Advisory Committee did not have a role in this case but the Board of Industrial Insurance Appeals noted that the medical advisory committee "apparently" did not review Kantor's audit. We note that the Medical Advisory Committee's osteopathic physician member took part in the peer review of Kantor's work and concluded that Kantor's treatment plans fell below accepted standards of good practice.

procedure contained in the agency's regulations, the agency's failure to follow the procedure will not prevent it from otherwise acting. *See generally Lumpkin v. Department of Soc. & Health Servs.*, 20 Wn. App. 406, 414, 581 P.2d 1060 (1978) (counseling mandated by agency regulation not a procedural prerequisite if not required by statute). Here, the Industrial Insurance Act does not provide for a Medical Advisory Committee; the Committee and its functions are the progeny of L&I's regulations and its role is advisory only. WAC 296-20-01001; WAC 296-20-020.

Further, neither the statute nor the regulations provide for any form of adjudication or review through the Medical Advisory Committee. And there is nothing in the regulations granting the Medical Advisory Committee any veto power over L&I. Thus, even assuming that L&I failed to involve the Committee in this case, it did not act ultra vires by proceeding without the Committee's advice. *See Lumpkin*, 20 Wn. App. at 414.

### A. Continuing Medical Education

 Kantor asserts that L&I lacked statutory authority to order him to undergo continuing medical education. We disagree.

The Industrial Insurance Act states that the director of L&I shall "[s]upervise the medical, surgical, and hospital treatment to the intent that it may be in all cases efficient and up to the recognized standard of modern surgery." RCW 51.04.020(4). To accomplish this task, the director shall "establish and adopt and supervise the administration of printed forms, rules, regulations, and practices for the furnishing of such care and treatment." RCW 51.04-.030(1).

Pursuant to this statutory authority, L&I promulgated a regulation that allows it to require a health care provider "to satisfactorily complete remedial education courses and/or programs." WAC 296-20-015(5)(e). This regulation is consistent with the Legislature's intent that all medical treatment of covered workers be "efficient and up to the recognized standard of modern surgery." RCW 51.04.020(4).

Kantor contends that the regulation conflicts with the Uniform Disciplinary Act (UDA), RCW 18.130. When two statutes conflict, we should make every effort to harmonize their respective provisions. *State v. Lessley*, 118 Wn.2d 773, 781, 827 P.2d 996 (1992). And when two statutes relate to the same subject but do not conflict, we give meaning and effect to both. *Martin v. Triol*, 121 Wn.2d 135, 148, 847 P.2d 471 (1993).

Here, WAC 296-20-015 and the UDA do not conflict because they relate to different subjects. The UDA is intended primarily to govern the eligibility of health care providers to hold a license to practice medicine within the state of Washington. RCW 18.120.020(7). Its purpose is

> to strengthen and consolidate disciplinary and licensure procedures for the licensed health and health-related professions and businesses by providing a uniform disciplinary act with standardized procedures for the licensure of health care professionals and the enforcement of laws the purpose of which is to assure the public of the adequacy of professional competence and conduct in the healing arts.

RCW 18.130.010.

The UDA applies only to those boards and commissions with jurisdiction over the licensure and discipline of health care providers in particular specialties. RCW 18.130.040. This includes the state board of osteopathic medicine and surgery, the body that determines Kantor's eligibility to hold a medical license. RCW 18.57.003; RCW 18.57.005. Under the UDA, "disciplinary action" refers to specific Department of Health (DOH) action affecting a health care provider's privilege to practice medicine within the state of Washington. RCW 18.130.020; RCW 18.130.160. A DOH disciplinary action may include requiring a license holder to complete a "specific program of remedial education or treatment." RCW 18.130.160(4); *see generally Heinmiller v. Department of Health*, 127 Wn.2d 595, 600, 903 P.2d 433, 909 P.2d 1294 (1995) (stay of license suspension conditioned on successful completion of remedial education program).

By contrast, WAC 296-20-015(5)(e) applies only to the

eligibility of health care providers to treat covered workers. The regulation does not affect the provider's privilege to practice and treat patients not covered by L&I. Consequently, WAC 296-20-105(5)(e) does not conflict with the UDA.

We also note that the UDA contemplates disciplinary actions by entities such as L&I. RCW 18.130.070(1) states in relevant part:

> The disciplining authority may adopt rules requiring any person, including, but not limited to, licensees, corporations, organizations, health care facilities, impaired practitioner programs, or voluntary substance abuse monitoring programs approved by the disciplining authority and state or local governmental agencies, to report to the disciplinary authority any conviction, determination, or finding that a license holder has committed an act which constitutes unprofessional conduct[.]

The above language in the UDA appears to anticipate that an agency such as L&I may make a finding of unprofessional conduct and to acknowledge that such a finding may be relevant to a licensing body's decision regarding a practitioner's privilege to practice medicine.[12]

Finding no conflict between WAC 296-20-015(5)(e) and the UDA, we conclude that L&I had the authority to require Kantor to satisfy its continuing medical education requirements.

## B. Standard of Care

Finally, Kantor, again relying on the UDA, RCW 18.130, argues that L&I lacked the authority to determine that he had violated the standard of care for osteopathic physicians. To support this argument, Kantor contends that the agency, by adopting its own definition of "medically necessary," "blatantly exceed[ed] the power granted L&I by the legislature."

---

[12]Further, the UDA does not apply to "any regulatory entity created prior to July 24, 1983, except as provided in this chapter." RCW 18.120.010.

An administrative regulation that conflicts with the intent and purpose of the legislation or exceeds the agency's statutory authority is invalid. *Superior Asphalt & Concrete Co. v. Department of Labor & Indus.*, 84 Wn. App. 401, 405, 929 P.2d 1120 (1996); RCW 34.05.570(2)(c). Here, Kantor has failed to meet his burden of showing that the regulation exceeds or is inconsistent with the statute. *Superior Asphalt & Concrete Co.*, 84 Wn. App. at 405; RCW 34.05-.570(1)(a).

 ██ As discussed above, L&I has broad statutory authority to decide claims for workers' compensation and to ensure that workers receive only "proper and necessary medical and surgical services." RCW 51.36.010; *Marley v. Labor & Indus.*, 125 Wn.2d 533, 539, 886 P.2d 189 (1994). Pursuant to its mandate, L&I promulgated the medical aid rules that include a definition of "medically necessary." WAC 296-20-01002.

The definition, care that is "[r]eflective of accepted standards of good practice within the scope of the provider's license or certification," is consistent with, not in excess of, L&I's statutory grant of authority to regulate the efficiency and quality of care provided to covered workers. WAC 296--20-01002; RCW 51.04.020(4); RCW 51.04.030. Further, it does not conflict with the UDA's function to regulate the licensing of health care providers. RCW 18.130.010.

Accordingly, we affirm the superior court's ruling affirming the conditions that L&I imposed on Kantor. We reverse its ruling as to Kantor's liability for excess payments and remand for findings of fact, conclusions of law, and judgment consistent with this opinion.

BRIDGEWATER, C.J., and ARMSTRONG, J., concur.

Reconsideration denied May 3, 1999.

Review denied at 139 Wn.2d 1002 (1999).