[No. 52168-3-I.   Division One.   March 29, 2004.]

JOHN BENNERSTROM, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, ET AL., *Respondents*.

*Philip J. Buri* (of *Buri Funston, P.L.L.C.*) and *Breean L. Beggs* (of *Center for Justice*), for appellant.

*Christine O. Gregoire, Attorney General,* and *Anastasia R. Sandstrom, Assistant,* for respondent Department of Labor and Industries.

*Christine O. Gregoire, Attorney General,* and *Lianne S. Malloy, Assistant,* for respondent Department of Social and Health Services.

Cox, A.C.J. — An employment relationship for purposes of the workers' compensation laws does not exist absent (a) the employer having a right to control the employee's physical conduct in the performance of the employee's duties and (b) the employee's consent to the employment relationship.[1] Here, there is no genuine issue of material fact whether John Bennerstrom consented to the employment relationship. Bennerstrom did not. Moreover, there is no genuine issue of material fact whether Bennerstrom is a domestic servant under applicable law. Bennerstrom is. Accordingly, we hold that the superior court properly granted summary judgment to the Department of Labor and Industries (DLI) and the Department of Social and Health Services and affirm.

Bennerstrom's mother, Jean Bennerstrom, suffered from significant cognitive loss and required total medical and day-to-day care prior to her death. Bennerstrom contracted with the state Department of Social and Health Services (DSHS) under the Community Options Program Entry System (COPES) to provide in-home care to Mrs.

---

[1] *Novenson v. Spokane Culvert*, 91 Wn.2d 550, 553, 588 P.2d 1174 (1979).

Bennerstrom. COPES is a Medicaid program that uses federal and state funds to pay for in-home service providers for Medicaid clients who would otherwise be placed in a nursing home. The written agreement between Bennerstrom and DSHS sets forth a number of terms and conditions, including a statement of work and a schedule of compensation by which DSHS paid Bennerstrom.

In August 1999, during the term of the most recent contract with DSHS, Bennerstrom suffered an injury when a car struck him while he was on his bicycle. The record reflects that he was on his way to the library to conduct research as part of a continuing education course for the COPES program. He applied for workers' compensation benefits in November 1999. DLI rejected his claim.

He appealed, and the Board of Industrial Insurance Appeals (BIIA) upheld the denial of benefits. Bennerstrom appealed the BIIA's decision to Whatcom County Superior Court. Both Bennerstrom and DSHS moved for summary judgment. The trial court granted DSHS's motion and denied Bennerstrom's.

Bennerstrom appeals.

## STANDARD OF REVIEW

RCW 51.52.110 and RCW 51.52.115 govern judicial review of matters arising under the Industrial Insurance Act. RCW 51.52.115 states:

> The hearing in the superior court shall be de novo, but the court shall not receive evidence or testimony other than, or in addition to, that offered before the board or included in the record filed by the board in the superior court as provided in RCW 51.52.110. . . . In all court proceedings under or pursuant to this title the findings and decision of the board shall be prima facie correct and the burden of proof shall be upon the party attacking the same. If the court shall determine that the board has acted within its power and has correctly construed the law and found the facts, the decision of the board shall be confirmed . . . .

Bennerstrom argues that the trial court erred by assuming that the BIIA's findings of fact were true, thus taking factual disputes away from a jury and violating RCW 51.52.115. Contrary to Bennerstrom's assertion, the trial court did not assume the BIIA's findings were true. The court considered the Certified Appeal Board Record, reviewed the legal authority submitted, held that there were no genuine issues of material fact, and affirmed the BIIA's ruling. The court's treatment was well within the controlling statutory framework, and we reject Bennerstrom's argument to the contrary.

When a party appeals from a BIIA decision, and the superior court grants summary judgment affirming that decision, the appellate court's inquiry is the same as that of the superior court.[2] Appellate review is based solely on the evidence and testimony presented to the BIIA.[3] We may substitute our own judgment for that of the agency regarding issues of law, but we give great weight to the agency's interpretation of the law it administers.[4] Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[5] We review questions of law de novo.[6]

## EMPLOYEE

Bennerstrom primarily contends that he was an employee of both DSHS and his mother, as the COPES care

---

[2] *Our Lady of Lourdes Hosp. v. Franklin County*, 120 Wn.2d 439, 451, 842 P.2d 956 (1993).

[3] RCW 51.52.115; *Johnson v. Weyerhaeuser Co.*, 134 Wn.2d 795, 800 n.4, 953 P.2d 800 (1998).

[4] *Dep't of Labor & Indus. v. Kantor*, 94 Wn. App. 764, 772, 973 P.2d 30, *review denied*, 139 Wn.2d 1002 (1999).

[5] CR 56(c); *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993).

[6] *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 813, 854 P.2d 1072 (1993).

recipient. We disagree and hold that Bennerstrom was not a DSHS employee.

■ "For purposes of workmen's compensation, an employment relationship exists only when: (1) the employer has the right to control the servant's physical conduct in the performance of his duties, and (2) there is consent by the employee to this relationship."[7]

■ For purposes of our analysis, we first consider the second of these two criteria. The failure to establish a genuine issue of material fact with respect to this second prong makes all other disputed facts immaterial for summary judgment purposes.[8]

## Consent Prong

Bennerstrom argues that the evidence in the record shows mutual assent to an employment relationship and that such evidence should have been submitted to a jury to resolve this issue. We disagree.

■ "A worker's bare assertion of belief that he or she worked for this or that employer does not establish an employment relationship."[9] In fact, the record shows that neither party consented to an employment relationship. The COPES contract states:

> Contractor Not Employee of DSHS *By signing this contract, the Contractor certifies that he/she is not a current DSHS employee, and will advise DSHS immediately should this status change.* This contract shall become null and void if the Contractor accepts employment with DSHS. The client shall have free choice of a qualified provider(s) as described under Washington Administrative Code, Chapter 388-15. *The Contractor performing under this agreement*

---

[7] *Novenson*, 91 Wn.2d at 553.

[8] *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

[9] *Jackson v. Harvey*, 72 Wn. App. 507, 519, 864 P.2d 975, *review denied*, 124 Wn.2d 1003 (1994).

*is not an employee or agent of DSHS. The Contractor shall not hold himself/herself out as nor claim to be an officer or employee of the State of Washington by reason hereof. The Contractor agrees not to make any claim, demand, or application to or for any right or privilege applicable to a DSHS or Washington State employee including, but not limited to, workmen's compensation coverage* or retirement membership or credit or any other benefit which would accrue to a civil service employee under Chapter 41.06 RCW.[10]

A contract, whether express or implied, is an important factor to consider in determining whether an employment relationship exists.[11]

The contract twice states that Bennerstrom, as a COPES contractor, is not a DSHS employee. It also requires immediate notification by Bennerstrom should that status change. There is no evidence in the record that prior to his injury Bennerstrom retreated from his written acknowledgement in the contract that either he was not an employee at the time that he signed the contract or that he would give notice of a change in his status. His written accknowledgements and failure to retreat from them are important factors in determining that no employment relationship exists.

Bennerstrom was again informed that he was not an employee of DSHS at his initial training, and received another document stating that he was not a DSHS employee. Bennerstrom acknowledged before the BIIA that he wrote a letter to DLI on December 8, 1999 stating that he was not an employee of DSHS. These uncontested facts support the conclusion that no employment relationship exists.

Bennerstrom's reliance on *In re Sylvia J. Booth*,[12] a BIIA decision, for the proposition that DSHS's creation of the

---

[10] Ex. 1 (emphasis added).

[11] *Clausen v. Dep't of Labor & Indus.*, 15 Wn.2d 62, 69, 129 P.2d 777 (1942).

[12] Bd. of Indus. Ins. Appeals Dec. No. 92-6148 (Jan. 23, 1995).

service plan, ability to monitor Bennerstrom's care for his mother, and its issuing of W-2 forms and paychecks evidences consent to an employment relationship is misplaced. Among the reasons is there is no indication in that opinion of an express contract or other documents that explicitly disavow an employment relationship between the parties. Moreover, that case gives no indication, as here, of the claimant's own declaration that he is not a DSHS employee. For these reasons, *Booth* is not helpful.

Nevertheless, Bennerstrom contends that because DSHS provided him with W-2 forms, this evidences consent to an employment relationship. But Bennerstrom's W-2 tax forms clearly state that his employer is Jean Bennerstrom in care of DSHS.[13] The fact that DSHS prepares W-2 forms for service providers rather than requiring recipients of care to perform that service is not dispositive, particularly where the recipient of care, not DSHS, is listed as the employer.

Significantly, Bennerstrom fails to explain how DSHS's ability to create a service plan, monitor his care of his mother, or issue paychecks to him evidences consent *on his part* to an employment relationship. As the cases indicate, the point of inquiry whether the putative employee consented to the relationship is that an employee gives up valuable rights, among them the right to sue the employer, by being subject to the workers' compensation act.[14] Focusing on the actions of DSHS does not assist us in determining whether Bennerstrom consented to the employment relationship for these purposes. Based on the record before us, we conclude there is no genuine issue of material fact that Bennerstrom lacked a belief that he was an employee of DSHS prior to his injury.

Bennerstrom's reliance on *In-Home Supportive Services v. Workers' Compensation Appeals Board*[15] is misplaced.

---

[13] Certified Appeal Board R. at 150-53.

[14] *Novenson*, 91 Wn.2d at 554.

[15] 152 Cal. App. 3d 720, 199 Cal. Rptr. 697 (1984).

The proposition for which he cites *In-Home* does not lead to the conclusion Bennerstrom advocates—that he is an employee of DSHS. *In-Home* concludes that being an employee of one organization "is not a barrier to the conclusion the state is also the worker's employer."[16] That case is inapposite in view of the controlling criteria we have discussed.

Bennerstrom argues in the alternative that the contract, which states that he was not an employee of DSHS, was a contract of adhesion and therefore invalid. This argument is unpersuasive.

■ Generally, an adhesion contract is prepared on a standard printed form, is prepared by one party and submitted to the other on a take it or leave it basis, and there is "'no true equality of bargaining power' between the parties."[17] No one disputes that the contract here is on a standard printed form.

■ But even if we were to assume for the purposes of argument that the contract between DSHS and Bennerstrom is a contract of adhesion, that does not end the inquiry. Bennerstrom must demonstrate that the challenged provision is unconscionable.[18] Bennerstrom fails to argue how the provision stating that he is not an employee of DSHS is unconscionable. And we fail to see how such a provision, by its terms, is unconscionable. Accordingly, we do not further address this argument.[19]

Bennerstrom fails to raise a genuine issue of material fact concerning whether he consented to an employment

---

[16] *In-Home*, 199 Cal. Rptr. at 704 (emphasis omitted).

[17] *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 393, 858 P.2d 245 (1993) (quoting *Standard Oil Co. v. Perkins*, 347 F.2d 379, 383 n.5 (9th Cir. 1965)).

[18] *Yakima*, 122 Wn.2d at 393 ("Assuming that we are dealing with an adhesion contract, it does not follow that the . . . clause is void. The characterization of a lease as an adhesion contract because exacted by reason of a gross disparity in bargaining power is to enable the court to protect the injured party from an unconscionable contract provision.") (quoting *Blakely v. Hous. Auth.*, 8 Wn. App. 204, 213, 505 P.2d 151, *review denied*, 82 Wn.2d 1003 (1973)).

[19] *See State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992).

relationship. There is nothing in the record to indicate any such consent.

### Control Prong

Recognizing that the controlling test has two prongs, Bennerstrom also contends that DSHS controlled the manner of his work by requiring him to attend classes, developing a service plan, setting his rate of pay, deducting taxes from his paycheck, monitoring his performance, and retaining the right to terminate the relationship. On this record, we conclude that there is no genuine issue of material fact to support the conclusion that DSHS controlled Bennerstrom's activities in the manner required under *Novenson*.[20]

■ Among those factors that we may examine to determine control are: (1) who controls the work to be done, (2) who determines the qualifications, (3) setting pay and hours of work and issuing paychecks, (4) day-to-day supervision responsibilities, (5) providing work equipment, (6) directing what work is to be done, and (7) conducting safety training.[21]

■ Bennerstrom argues that DSHS developed a detailed service plan that evidenced control over his work. The service plan was designed to identify those areas in which the COPES client, Mrs. Bennerstrom, needed assistance, and to identify what services were required to meet those needs. Although DSHS developed the service plan, it was based on the needs of Mrs. Bennerstrom, not DSHS. That DSHS committed these needs to paper in the form of the service plan does not make DSHS Bennerstrom's employer or lead to the conclusion that DSHS controlled Bennerstrom's physical performance of his duties. An example from Bennerstrom's own testimony illustrates this point.

---

[20] *Novenson v. Spokane Culvert*, 91 Wn.2d 550, 553, 588 P.2d 1174 (1979).

[21] *Sonners v. Dep't of Labor & Indus.*, 101 Wn. App. 350, 358, 3 P.3d 756, *review denied*, 142 Wn.2d 1008 (2000).

The service plan stated that Bennerstrom and his sister would "motivate and encourage client to agree to weekly baths on Wednesdays when daughter is visiting client from 10:00 a.m. - 4:00 p.m."[22] Bennerstrom testified that he and his mother decided when and how often she would be bathed, not DSHS. Bennerstrom controlled the physical performance of his duties, not DSHS.

Although Bennerstrom challenges the BIIA's finding of fact 6 that he was not required to follow suggestions from DSHS, he fails to cite to the record to support this contention. He points to nothing in the record, and we have not found anything, that indicates that he was required to follow DSHS suggestions or that he was not free to determine the manner in which he would care for his mother. In fact, Bennerstrom testified that he did what he thought was best for his mother and would disregard DSHS suggestions or offers for additional assistance. Bennerstrom used his own equipment, including creative slings for transferring his mother, and found materials to construct ramps in the home to provide greater mobility for Mrs. Bennerstrom. He rejected suggestions by DSHS to take his mother to her previous physician, enlist the help of a bath aid, and use a particular type of harness for lifting and transferring his mother. There is simply no evidence in the record that DSHS controlled Bennerstrom's physical performance of his duties.

Bennerstrom also argues that DSHS determined qualifications by requiring him to participate in specific training classes. This point is not contested. There were required classes that COPES care providers had to attend before becoming eligible for participation in the program. This fact does not compel the conclusion that DSHS controlled Bennerstrom's activities. The requirements of minimal education were necessary in order to be paid through the COPES program, not to provide care to his mother.

---

[22] Ex. 10—Service Plan/Comprehensive Assessment (July 15, 1999).

Bennerstrom next argues that DSHS set his rate of pay. The legislature, not DSHS, sets the rate of pay for the COPES program.[24]

Bennerstrom also argues that the paychecks were issued by DSHS and that DSHS deducted taxes from his paychecks. This is not contested. But the money in those paychecks represented what his mother was qualified to receive for her care, not payment from DSHS to an employee. Furthermore, pursuant to an Internal Revenue Service (IRS) agreement, DSHS was required to deduct Federal Insurance Contributions Act and Federal Unemployment Tax Act taxes from the paychecks of COPES care providers. This agreement was not based on a determination that DSHS was the employer of the care providers but because the IRS determined that DSHS, as the program administrator, had legal control of the money used to pay COPES care providers.

Bennerstrom also argues that DSHS monitored his performance and could visit unannounced at any time. Bennerstrom overstates his point. The contract states: "[a]uthorized persons shall have the right to examine the Contractor's compliance with the terms of the contract and Statement of Work Exhibit A. DSHS shall give the Contractor notice of monitoring, auditing, observation and other visits by its officers and employees to the Contractor's place(s) of business whenever possible."[25] Contrary to Bennerstrom's assertion, the record does not indicate that DSHS could visit and monitor his activities without any notice. And Bennerstrom testified that most of the visits by DSHS employees were arranged ahead of time. This is neither evidence of the type of control that an employer exerts over an employee nor inconsistent with a government agency's duty to monitor performance under a contract involving the expenditure of public funds.

---

[24] LAWS OF 1999, ch. 309, § 207(5).

[25] Ex. 1.

Finally, Bennerstrom argues that DSHS was able to terminate the relationship and that this evidenced the requisite control under *Novenson*. No one disputes that DSHS could terminate Bennerstrom from participation in the COPES program. What is disputed by Bennerstrom is what this means under the *Novenson* analysis.

Under the contract, termination could occur for the following reasons: (1) failure of the contractor to perform any contract provisions, (2) failure of the contractor to perform the services in such a manner that ensures the health and safety of the client, (3) violation of the Ethics in Public Service Act, and (4) when it is in the best interests of DSHS.

But Bennerstrom does not contend that he could be, or was ever threatened with, termination from the COPES program because of his failure to follow DSHS advice concerning his physical performance of his duties. DSHS simply controlled participation in the program. This fact does not, on the record before us, lead to the conclusion that DSHS had the physical control of an employer over Bennerstrom's daily activities caring for his mother.

We conclude that Bennerstrom has not met the control prong of *Novenson*. In any event, to the extent there is any genuine factual dispute on this point, it is not material for purposes of summary judgment given the lack of any genuine issue of material fact on the consent prong.[25]

██ Bennerstrom also appears to argue in the alternative that even if he was not an employee of DSHS, he is nevertheless eligible for workers' compensation benefits because he was an independent contractor of DSHS.[26] Bennerstrom provides no citation to authority, persuasive

---

[25] *Young*, 112 Wn.2d at 225.

[26] Opening Br. of Appellant at 18 ("Whether considered a DSHS employee or an independent contractor, Bennerstrom worked as an in-home care provider and is eligible for benefits.").

argument, or analysis to support this contention. Accordingly, we need not consider it.[27]

We need not address DSHS's contention that Bennerstrom cannot be a State employee because he was not hired in accordance with the State civil service law.

We conclude that Bennerstrom fails to establish that he meets either prong of the *Novenson* test. He is not a DSHS employee. He does not qualify for workers' compensation benefits.

## DOMESTIC SERVANT EXCEPTION

Bennerstrom contends that the court erred when it concluded that he was a domestic servant and excluded from industrial insurance coverage under RCW 51.12-.020(1). We conclude Bennerstrom was a domestic servant and thus excluded from coverage under that statutory provision.

■■■ RCW 51.12.020(1) excludes from industrial insurance coverage "[a]ny person employed as a domestic servant in a private home by an employer who has less than two employees regularly employed forty or more hours a week in such employment." "The meaning of domestic servant is resolved as a matter of law because it involves defining a statutory term." *Everist*.[28]

■■■ *Everist* is one of two cases interpreting RCW 51.12-.020(1) and is controlling. In *Everist*, the court concluded that a woman who was employed by a couple to provide myriad in-home services fell within the domestic servant exception in RCW 51.12.020(1). Everist's duties for the couple included daily exercising, bathing, preparing and feeding meals, dressing, giving assistance to and from the car, administering daily medications, flossing and cleaning teeth, turning down the bed, giving urination assistance, cleaning,

---

[27] *See Johnson*, 119 Wn.2d at 171.

[28] *Everist v. Dep't of Labor & Indus.*, 57 Wn. App. 483, 485-86, 789 P.2d 760, *review denied*, 114 Wn.2d 1027 (1990) (citing *Leschi Improvement Council v. Wash. State Highway Comm'n*, 84 Wn.2d 271, 283, 525 P.2d 774 (1974)).

and doing laundry.[29] After examining cases from other jurisdictions, the court held that "[o]nly where the person's duties included care for a particular individual *without general household duties* have the courts found the persons not to be domestic servants."[30] The court noted: "[o]ther jurisdictions faced with this issue have concluded that a person charged with domestic duties is a domestic servant even though a significant percentage of the person's efforts are devoted to caretaking for a particular individual."[31]

Bennerstrom argues that *Everist* is distinguishable because Everist's medical responsibilities were inconsequential and did not counterbalance her housekeeping duties. But the holding in *Everist* was not a balancing test between personal care and household duties. Where a claimant performs a mix of individual care and household duties, that claimant is a domestic servant.

Bennerstrom's duties under the service plan created by DSHS included cooking, cleaning, doing laundry, transferring Mrs. Bennerstrom from bed to chair to bathtub to toilet, feeding her, applying creams to dry skin, tending to her personal hygiene, dressing her, administering vitamins and supplements, monitoring the health of her skin, including the application of duoderm, shopping, and running other errands. Bennerstrom testified that he did "everything" including bathing, dressing, feeding, making food, doing laundry, washing dishes, cleaning windows, and banking and bill paying for his mother.

Bennerstrom contends that his duties more closely resemble the duties of the workers in two cases relied on by the *Everist* court in reaching its decision. In *Viola v. Workmen's Compensation Appeal Board*,[32] the claimant's duties included " 'administering medication, helping Mrs. Viola in and out of the bath tub and bed, assisting in getting

---

[29] *Everist*, 57 Wn. App. at 485.

[30] *Everist*, 57 Wn. App. at 487 (emphasis added).

[31] *Everist*, 57 Wn. App. at 487.

[32] 121 Pa. Commw. 47, 549 A.2d 1367 (1988).

her dressed, and feeding her. She did not perform any housework, and her duties could be compared to those of a nurse's aide.' "[33] The court noted that "[a]ll of Claimant's job duties as found by the referee and supported by substantial evidence in the record related solely to the unique needs of Mrs. Viola, rather than the general needs of the household."[34]

In *McCallister v. Workers' Compensation Appeals Board*,[35] the claimant's duties included feeding, bathing, changing clothes, and fixing the bed.[36] That court concluded that "where Mrs. McCallister performed, and was expected to perform, only those duties directly related to the care and comfort of Mrs. Feliz, and where Mrs. McCallister did not perform, and was not expected to perform, any services connected with the general operation and maintenance of the household or the house, she was not engaged in household domestic service."[37]

Bennerstrom's duties are not distinguishable from the duties in *Everist*. And while Bennerstrom performed the activities discussed in *Viola* and *McCallister*, he performed many other duties, including general household duties such as cleaning his mother's living space, doing her laundry, shopping for her, and running errands.[38]

We conclude, as did the superior court, that Bennerstrom was a domestic servant as defined in RCW 51.12.020(1) and controlling case law.

Bennerstrom also argues that Everist was paid for all of her work, domestic or otherwise, whereas he was paid only for the medical care of his mother under the COPES

---

[33] *Viola*, 549 A.2d at 1368 (quoting referee's findings of fact).

[34] *Viola*, 549 A.2d at 1369.

[35] 61 Cal. App. 3d 524, 132 Cal. Rptr. 527 (1976).

[36] *McCallister*, 132 Cal. Rptr. at 528.

[37] *McCallister*, 132 Cal. Rptr. at 530 (emphasis omitted).

[38] *See Everist*, 57 Wn. App. at 486 ("Here, Everist cooked and cleaned, duties falling squarely within the offices of a domestic servant.").

program. We do not agree with Bennerstrom's characterization of the record.

As discussed above, the service plan did contemplate Bennerstrom performing general household duties such as laundry, cleaning, and shopping for the benefit of his mother's household because she was in need of "total assistance." Some of these activities, including shopping and laundry, were scored in the Comprehensive Assessment as compensable activities. And just because Bennerstrom did those activities for his mother's benefit does not transform them into "medical" activities or care. As noted in *Everist*, "[d]omestic servant has been defined as follows: '"[A] person hired or employed primarily for the performance of household duties and chores, the maintenance of the home, *and the care, comfort and convenience of members of the household*." ' "[39]

Furthermore, the fact that Bennerstrom was not compensated for some household duties is not controlling because it was his household also. That he was not compensated for such activities as cleaning the windows or mowing the lawn, but was compensated for the household duties pertaining to his mother's living environment does not affect the reasoning here.

Bennerstrom's contention that his caregiver and continuing education courses somehow transformed his general household duties into medical or personal care duties is unpersuasive. Bennerstrom cites no authority to support this proposition.

We note that *The Fundamentals of Caregiving Student Manual*, which is in the record and was a manual that Bennerstrom received during training, states that the purpose of the training is "to help you learn the *basic skills* you will need to be a caregiver working with adults with developmental, mental, and/or physical disabilities."[40]

---

[39] *Everist*, 57 Wn. App. at 486 n.5 (emphasis added) (quoting *Gunter v. Messereau*, 7 Or. App. 470, 472-73, 491 P.2d 1205 (1971)).

[40] Ex. 4 (emphasis added).

There is no support in the record for Bennerstrom's contention that all of his activities rose to the level of medical care.

The second of two cases interpreting RCW 51.12.020(1) is *Dana's Housekeeping v. Department of Labor & Industries*,[41] on which Bennerstrom relies. That case is distinguishable.

There, a commercial housekeeping business that employed housecleaners as independent contractors challenged an industrial insurance tax assessment, arguing that the domestic servant exclusion applied to a commercial enterprise. This court held otherwise and concluded "that Dana's cannot rely on the domestic servant exclusion to avoid industrial insurance taxes" because "RCW 51-.12.020(1) does not exclude domestic servants working for a commercial enterprise in many, different private homes."[42] The court also noted that "because the purpose of workers' compensation is to place the burden of injury from industrial causes on industry, 'domestic servant' must be defined with reference to whether the master attempts to profit in an entrepreneurial capacity from the servant's labor."[43]

The reasoning in *Dana's Housekeeping* is inapplicable here because it dealt with a commercial enterprise. To the extent Bennerstrom attempts to equate DSHS to the employer in *Dana's Housekeeping*, his argument is unpersuasive. And, as noted above, Bennerstrom fails to persuasively brief his contention that he is an independent contractor.

We conclude that summary judgment in favor of DSHS was proper. Bennerstrom did not consent to an employment relationship with DSHS and is a domestic servant excluded from industrial insurance coverage.

---

[41] 76 Wn. App. 600, 886 P.2d 1147, *review denied*, 127 Wn.2d 1007 (1995).

[42] *Dana's*, 76 Wn. App. at 611.

[43] *Dana's*, 76 Wn. App. at 611.

We affirm the summary judgment order.

GROSSE and AGID, JJ., concur.

Review denied at 152 Wn.2d 1031 (2004).