[No. 33060-8-I.    Division One.    January 10, 1994.]

HAROLD L. JACKSON, *Appellant,* v. S.L. HARVEY, ET AL, *Respondents.*

*Michael T. Davis* and *Law Offices of Douglas W. Scott,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Michael K. Davis-Hall, Assistant; Patrick H. LePley,* for respondents.

KENNEDY, J. — Harold Jackson appeals the trial court's judgment affirming the decision of the Board of Industrial Insurance Appeals (the Board) denying him benefits under the Industrial Insurance Act, RCW Title 51. While working on the home of Shannon and Steve Cotterill, Jackson fell off the roof and suffered serious injuries. The Board determined that Jackson was not entitled to benefits, as he was employed by the homeowners to renovate their house. Homeowners hiring workers to renovate their homes are exempt from providing workers' compensation coverage. *See* RCW 51.12.020. Jackson argued that he was employed by S.L. Harvey, the homeowner's brother, who is an independent contractor who was working on the house, and who is not exempt from providing coverage under the act.

The issue on appeal is what legal test to apply in order to ascertain when an employment relationship exists for purposes of the Industrial Insurance Act, RCW Title 51. Without necessarily adopting a test encompassing the whole act, we hold that an employee must consent to employment by an employer exempted from providing coverage under the act. It being undisputed that Jackson reasonably believed that he was employed by Harvey, and did not consent to employment by the homeowners, we reverse.

We also hold that the Department of Labor and Industries' accident and/or medical aid funds will be "affected by" this decision. Therefore, we hold that Jackson's attorney fees must be paid out of the Department's administrative fund, pursuant to RCW 51.52.130.

FACTS

I

Statement of the Case

The following facts are undisputed. Harold Jackson is a journeyman carpenter. Shawn Harvey is a licensed general contractor doing business as S.L. Harvey, Contractor. He is not registered with the Department of Labor and Industries (the Department). Steven and Shannon Cotterill are Snohomish homeowners. In 1991, they enlisted the help of Shan-

non's brother Shawn Harvey in significantly renovating their home.

The Cotterills originally hired only Harvey, but when the job became too large, Tim Chonsena, Bob Lecture and Randy Hudon were also hired. Lecture and Hudon assisted in the demolition while Chonsena and Harvey did "general contract work". Steven Cotterill helped as well. The record does not clarify how the additional workers were hired, but the industrial appeals judge did make an undisputed finding that Randy Hudon was Harvey's employee.

Both the Cotterills and Harvey performed tasks which suggest that either of them might have been the "employer" on the job. Harvey created the blueprints for the project and obtained a remodeling permit. He also controlled and directed the progress of the work performed by the other workers. The Cotterills obtained additional permits and paid for all necessary supplies, ultimately about $32,000 worth. They paid Harvey an hourly wage, writing him a check once a month.

Inclement weather threatened the project, so Harvey sought and received the Cotterills' permission to hire additional help. Harvey contacted Jackson, asking for help on the house. He did not discuss with Jackson who owned the house. Jackson accepted the work, and asked that Michael Creasey, Jr., also be hired. Without consulting the Cotterills, Harvey agreed to also hire Creasey. Harvey and Jackson discussed Creasey's rate of pay, but not Jackson's. Jackson had worked for Harvey once in the past. Before Jackson began work on the Cotterill home, Harvey asked him to work on a house Harvey was constructing in Redmond and Jackson agreed to do so. At this point, Jackson believed that he was working for Harvey.

The Cotterills did not know that Harvey had hired Jackson, as opposed to a different carpenter, until Jackson appeared at their house. Jackson recognized the Cotterills, in that he had known them in high school. He and the Cotterills had some conversations while Jackson was at the house, but the Cotterills did not inform Jackson that they, not Harvey, were

Jackson's employers and would be paying his wages. Harvey also never told Jackson that the Cotterills were his employer.

Jackson began working at the Cotterills' home on August 26, 1991. Just as with the other workers, Harvey managed and directed Jackson's work done on the house. Jackson was injured on his second day on the job, August 27, 1991. The roof was wet and slippery, causing him to fall off. He severely damaged his right wrist and broke his pelvis. He has required and will continue to require medical treatment and will be in need of job retraining.

Harvey admitted to Jackson, after the fall, and later admitted at the Board's hearing, that he was not registered with the Department, and therefore had not been paying industrial insurance taxes for any of his employees.

While in the hospital, Jackson first learned that Harvey and the Cotterills contended that Jackson was actually employed by the Cotterills. Sometime later Jackson received a check from the Cotterills for work performed. The check was dated September 2, 1991, and made in the amount of $225 (the notation line calculates 15 work hours at $15/hour).[1]

## II
## Procedural History

Two weeks after the accident Jackson applied to the Department for benefits under the Industrial Insurance Act. The Department initially denied Jackson's request, but reversed this decision on November 14, 1991. Harvey protested this determination. By order of January 9, 1992, the Department again found that Jackson had been employed by Harvey on the date of the injury. Thus, he was entitled to benefits. Har-

---

[1] Exhibit 1 contains three other checks from the Cotterills' personal account:
>To: Creasey, $320, August 30, 1991;
>To: Lecture, $200, September 16, 1991;
>To: Hudon, $150, September 25, 1991.
Hudon testified at the hearing that when he received his check, he did not know what it was for, as he had already been paid by Harvey. Harvey testified that his earlier payment to Hudon was for work on some other project.

vey appealed to the Board of Industrial Insurance Appeals on January 22, 1992.

An industrial appeals judge heard the parties' testimony. In his findings of fact he determined that, although Jackson believed he was working for Harvey, he was actually working for the Cotterills. In his written opinion, the judge listed several reasons why Jackson believed he was employed by Harvey: (1) Jackson and Harvey had prior employment dealings; (2) the conduct of all of the parties up to the time of the accident; (3) the discussions about hiring Jackson were done by Harvey alone; (4) Jackson was never informed that he was employed by the Cotterills.

Believing Jackson's subjective belief of who employed him to be irrelevant, the industrial appeals judge entered a proposed decision and order in favor of Harvey, reversing the Department's earlier determination. The appeals judge relied upon the nature of the relationship between Harvey and the Cotterills, holding that it precluded a finding that Harvey employed Jackson. He gave five reasons for this conclusion: (1) the Cotterills wrote all of the paychecks; (2) the Cotterills hired Harvey for his personal labor; (3) Harvey was paid on an hourly basis; (4) Harvey had to obtain the Cotterills' consent in order to hire other workers for the job; (5) Harvey was not compensated for the work done by the other workers. On November 13, 1992, the Board denied Jackson's subsequent petition for review.

The case was tried before the Snohomish County Superior Court, which affirmed the Board's decision and entered findings, conclusions and an order affirming on June 22, 1993. Jackson moved for reconsideration. The trial judge denied the motion for reconsideration on July 1, 1993. This timely appeal followed.

DISCUSSION

■ Jackson appeals the Superior Court's decision affirming the Board of Industrial Insurance Appeals. The findings of fact are not disputed. We must determine whether the conclusions of law of the Superior Court flow therefrom.

*Department of Labor & Indus. v. Moser,* 35 Wn. App. 204, 208-09, 665 P.2d 926 (1983).

■ Jackson argues that the Board and the Superior Court did not apply the proper rule of law to Harvey's claim that the Cotterills employed Jackson. Harvey responds that the case law Jackson relies on should not apply in this context. The Board ruled in favor of Harvey. We are mindful of the deference with which the courts approach the Board's interpretation of the act. Nevertheless, the courts are not bound by the Board's interpretation of the act. *Weyerhaeuser Co. v. Tri,* 117 Wn.2d 128, 138, 814 P.2d 629 (1991). The act is to be liberally construed to insure that disabled workers receive compensation. RCW 51.12.010; *Department of Labor & Indus. v. Landon,* 117 Wn.2d 122, 126, 814 P.2d 626 (1991).

# I
## Employee's Consent to Employment

■ RCW Title 51, Industrial Insurance, does not define how courts should ascertain whether or not an employment relationship exists in any given case. RCW 51.08.070 defines "employer" as:

> any person, body of persons, corporate or otherwise, and the legal representatives of a deceased employer, all while engaged in this state in any work covered by the provisions of this title, by way of trade or business, or *who contracts with one or more workers, the essence of which is the personal labor of such worker or workers.* Or as a separate alternative, persons or entities are not employers when they contract or agree to remunerate the services performed by an individual who meets the tests set forth in subsections (1) through (6) of RCW 51.08.195.

(Italics ours.) The definition of "worker" found in RCW 51.08-.180 tracks these same principles:

> (1) "Worker" means every person in this state who is engaged in the employment of an employer under this title, whether by way of manual labor or otherwise in the course of his or her employment; *also every person in this state who is engaged in the employment of or who is working under an independent contract, the essence of which is his or her personal labor for an employer under this title,* whether by way of manual labor or otherwise, in the course of his or her employment, or as a sepa-

> rate alternative, a person is not a worker if he or she meets the tests set forth in subsections (1) through (6) of RCW 51.08.195[.]

(Italics ours.) RCW 51.08.195 lists the exceptions to who is a "worker" or an "employer" under RCW Title 51. These generally describe the characteristics of independent contractors; *i.e.*, a person who is free to perform a service without control or direction in how to do so, and who operates an independently established trade, occupation, profession or business of the type for which he or she has been contracted, and who maintains a separate set of books and records that reflect all items of income and expenses of the business which the individual is conducting. RCW 51.08.195(1), (2), (3), (6). Jackson does not fit into this exception, so he is clearly a "worker" under the title.

RCW Title 51 not only defines who is and is not a worker or employer, but also defines several types of employment which are exempted from the title's coverage. RCW 51.12-.020 states in relevant part:

> The following are the only employments which shall not be included within the mandatory coverage of this title:
>
> . . . .
>
> (2) Any person employed to do gardening, maintenance, repair, remodeling, or similar work in or about the private home of the employer.

This is the provision upon which Harvey relies in arguing that, as the Cotterills' employee, Jackson is not entitled to benefits under the act.

Both the Cotterills and Harvey arguably could meet the act's general definition of "employer". We therefore turn to the judicial interpretation of RCW Title 51 for guidance.

In deciding upon the existence of an employee-employer relationship, courts originally looked to respondeat superior, asking what degree of control an employer exercised over the employee. *Hubbard v. Department of Labor & Indus.*, 198 Wash. 354, 88 P.2d 423 (1939). The contractual terms, if any, did not alone establish the degree of control. Rather, courts looked to all of the "surrounding indicia of control". *Hubbard*, 198 Wash. at 360.

By 1959, the Washington Supreme Court began looking more to the agreement between the worker and employer in determining whether an employment relationship existed. In *Wilkie v. Department of Labor & Indus.*, 53 Wn.2d 371, 334 P.2d 181 (1959), a logger asked a man working nearby to help in repairing a tractor. The man agreed, and was subsequently injured while working on the tractor. There had been no discussion of employment terms. The court held that the helper was entitled to workers' compensation. The brief exchange between the two men, coupled with the "going set rate" of $2 per hour in the area, supported the jury's determination that the two men created an employee-employer contract. *Wilkie*, 53 Wn.2d at 376.

Subsequent to *Wilkie*, Washington courts explicitly adopted a 2-prong test for determining whether an individual has entered an employee-employer relationship in the workers' compensation context:

> For purposes of workmen's compensation, an employment relationship exists only when: (1) the employer has the right to control the servant's physical conduct in the performance of his duties, and (2) there is consent by the employee to this relationship.

*Novenson v. Spokane Culvert & Fabricating Co.*, 91 Wn.2d 550, 553, 588 P.2d 1174 (1979) (citing *Fisher v. Seattle*, 62 Wn.2d 800, 384 P.2d 852 (1963)); *Marsland v. Bullitt Co.*, 71 Wn.2d 343, 428 P.2d 586 (1967). Thus, the employment relationship must be entered into mutually by the employer and employee. *Novenson*, at 553.

As indicated, at common law whether an employment relationship existed or not was determined by the extent of control the employer had over the employee's activities. *Novenson*, at 554. This was so because the law primarily sought to establish the bounds of vicarious liability.[2] Thus, whether or not someone was an employee affected the rights as between

---

[2]In the *Hubbard* opinion, the court was faced with determining if Hubbard was an employee or an independent contractor. The issue of control was central there because an individual is an independent contractor if the employer did not have sufficient control over the means by which the worker completed the work.

an injured third person and the alleged employer. The employee was not affected by the determination concerning the scope of his or her employment. *Novenson*, at 554.

In workers' compensation law, however, the existence of an employment relationship affects the rights of the employee as much as the employer. The relationship is an agreement between the two. Therefore, for workers' compensation purposes the consent of the employee in entering the relationship becomes crucial in ascertaining whether an employment relationship exists.[3] *Novenson*, at 555.

In *Novenson*, the worker was hired by Kelly, a temporary services agency, and sent to the Spokane Culvert factory. He worked at the factory for 3 successive days. On the third day his hands were drawn into a piece of machinery and crushed. *Novenson*, at 551. The worker received industrial insurance through Kelly, and sued Spokane Culvert for negligence. Spokane Culvert moved for summary judgment, arguing that as its employee, Novenson could not sue Spokane Culvert in tort. *Novenson*, at 552.

Adopting the aforementioned 2-prong test, the *Novenson* court reversed the trial court's grant of summary judgment to Spokane Culvert. *Novenson*, at 555. The court held that material issues of fact remained concerning Novenson's consent to be a Spokane Culvert employee. *Novenson*, at 555.

In *Fisher v. Seattle, supra*, the court made the same determination in a similar context. Fisher was a filling station attendant hired by Standard Stations. He was injured when gases from a nearby city dump seeped into the station and exploded when Fisher turned on the station's oil burner. *Fisher*, 62 Wn.2d at 801.

The filling station was owned by Standard Oil Company of California. Standard Stations agreed to operate Standard Oil's filling stations. Standard Oil agreed to provide management personnel and money for station operations. Standard

---

[3]*Novenson* cites *Fisher*, which in turn cites 1B A. Larson, *Workmen's Compensation* §§ 47.42(a), 48.10 (1978). Larson explains that, because both an employee and an employer lose and gain certain rights when entering into an employment relationship, these rights are reciprocal, requiring mutual agreement.

Oil then entered into an agreement with Western Operations, Inc., whereby Western performed Standard Oil's responsibilities vis-a-vis Standard Stations. Standard Stations knew of, and complied with, this relationship. *Fisher*, 62 Wn.2d at 802.

Fisher sued Western Operations for negligence in letting the gas seep into the building. Western Operations moved for summary judgment, asserting that Fisher was an employee and therefore could not sue Western in tort. Fisher made a cross motion to strike Western's immunity defense, contending that he thought that he was a Standard Stations employee, as he was hired and paid by Standard Stations. *Fisher*, at 802.

The Supreme Court, recognizing the mutual nature of an employment relationship, reversed the trial court's order in Western's favor and granted Fisher's cross motion. *Fisher*, 62 Wn.2d at 808. The court stated that no employment relationship may exist without the consent of the employee. *Fisher*, 62 Wn.2d at 807.[4]

The consent portion of the 2-prong test has also been applied by the Washington Court of Appeals. *See, e.g., Smick v. Burnup & Sims*, 35 Wn. App. 276, 666 P.2d 926 (1983) (question of fact existed as to whether cable company warehouse supervisor consented to employment relationship where he voluntarily helped a subcontractor hired to lay cable and was injured in doing so); *Meads v. Ray C. Roberts Post 969, Inc.*, 54 Wn. App. 486, 774 P.2d 49 (1989) (triable issue of fact remained concerning consent to employment with parent company where bartender working for a subsidiary company fell down stairs in a building that, unbeknownst to bartender at the time, was owned by parent company, and bartender subsequently sued the parent company).

Harvey argues that *Fisher* and its progeny apply only when an employer affirmatively asserts an employment relationship in order to claim immunity from negligence actions. He asserts that this difference makes the *Novenson* test a

---

[4]*Marsland v. Bullitt Co., supra*, and *Belnap v. Boeing*, 64 Wn. App. 212, 220, 823 P.2d 528 (1992), both apply the 2-prong test, but focus on the right-to-control prong.

poor fit in the context of this case, where an employer is disavowing an employment relationship.[5]

We believe, however, that the justification underlying the *Novenson* test applies equally in this case. An employee who agrees to be employed by a homeowner for home renovation work gives up important statutory insurance benefits. We hold that such an employee must consent to that employment relationship. Requiring this consent allows the employee an opportunity to make an informed choice about accepting employment for which there is no industrial insurance coverage. Thus, the primary focus is properly on the employee's consent to the employment relationship.

Harvey argues that this focus unfairly foists upon Harvey a relationship to which *he* did not consent. We are unmoved by this assertion. Assuming that, before Jackson's accident, Harvey and the Cotterills had an arrangement as to who was or was not Jackson's employer, they alone had the knowledge of this agreement. As between them and Jackson, they had the superior knowledge of how the working relationships were to be arranged. Had disclosure been made to Jackson, Jackson would have had clear information concerning who his employer was. This would have provided him the opportunity to make an informed choice as to whether or not he wanted to work for an employer exempted from providing workers' compensation coverage.[6] As one court has stated:

---

[5]The *Meads* case cited *supra*, stated,
> Washington law on the issue of employer immunity is firmly settled and has been consistently applied. . . . immunity does not exist unless it can also be shown that the employee consented to the employment relationship.

*Meads*, 54 Wn. App. at 488-89 (citing *Novenson*; *Fisher*; *Smick*). The *Meads* court's opinion does suggest that the 2-prong test is tailored to determining when immunity exists.

[6]This reasoning does imply some sophistication on a worker's part in that he or she would require some knowledge of workers' compensation law to know about the homeowner's exemption. There is some evidence in the record that Jackson had this knowledge. Our ruling does not turn on that evidence, however. It is the *opportunity* for a worker to make an informed choice and not a worker's actual knowledge of workers' compensation law that is the basis of our decision.

It is out of accord with the spirit and purpose of the compensation law that an employee when injured be put to the task of guessing who his employer is to whom he must look for compensation, and be bandied about from one to another, so that in the end all may escape.

*Lee v. Oreon E.&R.G. Scott Realty Co.*, 96 S.W.2d 652, 654-55 (Mo. Ct. App. 1936).

Focusing on Jackson's consent, the undisputed facts show that Jackson reasonably believed that he was working for Harvey and not the Cotterills. Harvey contacted Jackson. Harvey hired Jackson. Harvey discussed employment terms with Jackson, although not in any detail. Before beginning work at the Cotterills' house, but after having been hired, Jackson agreed to work for Harvey on another site as well. Once Jackson arrived at the Cotterills' house, Harvey directed Jackson's activities on the job and told Jackson what job needed doing next.

Jackson never consented to employment by the Cotterills. Both of the Cotterills testified that their conversations with Jackson never amounted to more than small talk and pleasantries. Neither of the Cotterills ever discussed employment with Jackson. Harvey never told Jackson that the Cotterills were his employers, or that they would be paying him directly. Indeed, the Cotterills did not know that Jackson, in particular, would be working for them until his first day at their home.

We want to emphasize that it is clear from this record and the above facts that Jackson *reasonably* believed that he worked for Harvey. A worker's bare assertion of belief that he or she worked for this or that employer does not establish an employment relationship. Here, in light of the undisputed facts, any reasonable person in Jackson's position would have believed himself or herself to be working for Harvey. This is an objective determination of the employee's reasonable belief.

RCW 51.12.010 provides that:

This title shall be liberally construed for the purpose of reducing to a minimum the suffering and economic loss arising

from injuries and/or death occurring in the course of employment.

Given the conflicting social policies involved here, our holding best comports with this purpose.

## II
### Attorney Fees

Jackson asks for attorney fees pursuant to RCW 51.52.130.[7] The Department responds that this court can fix the attorney fees pursuant to the statute, but that Jackson's attorney fees should not be paid from the Department's administrative fund. We disagree.

The Department argues that the accident and/or medical aid funds will not be "affected by" a reversal of the Board's decision. The Department, after initially denying Jackson's claim, granted benefits to Jackson. It argues that a reversal will merely reinstate Jackson's pre-appeal status. Harvey, not the Department, appealed to the Board. The Department reasons that its accident and medical funds will not be affected because the Department had already accepted the responsibility to pay Jackson out of those funds. The Department contends that it should not be penalized for having

---

[7]Effective July 25, 1993, RCW 51.52.130 reads:

"If, on appeal to the superior or appellate court from the decision and order of the board, said decision and order is reversed or modified and additional relief is granted to a worker... a reasonable fee for the services of the worker's ... attorney shall be fixed by the court. In fixing the fee the court shall take into consideration the fee or fees, if any, fixed by the director and the board for such attorney's services before the department and the board. If the court finds that the fee fixed by the director or the board is inadequate for services performed before the department or board, or if the director or the board has fixed no fee for such services, then the court shall fix a fee for the attorney's services before the department, or the board, as the case may be, in addition to the fee fixed for the services in the court. If, in a worker... appeal the decision and order of the board is reversed or modified and *if the accident fund or medical aid fund is affected by the litigation . . .* the attorney's fee fixed by the court, for services before the court only, and the fees of medical and other witnesses and the costs shall be payable out of the administrative fund of the department." (Italics ours).

agreed with Jackson's position from the outset of the appeals process.[8]

■ The statute does not distinguish between the Board and the Department. Rather, it states that when the Board is overturned on appeal and, as a result, the Department is required to pay the worker from the accident and/or medical aid funds, the Department must also pay the worker's attorney fees. The statute treats the Board and the Department as aligned in interest. It takes no notice and makes no special provisions for when the Department believes the worker is entitled to benefits, but is reversed by the Board's decision. *Accord Spring v. Department of Labor & Indus.*, 39 Wn. App. 751, 757, 695 P.2d 612 (1985) ("such fees are to be assessed against the Department only when the Board is found to have erred").

This position comports with the Department's own logic. The Department argues that, in effect, the accident and medical aid funds were "debited" the amount owed to Jackson by virtue of the Department's decision to grant benefits. Thus, the Department contends, to grant those benefits on appeal effects no change — the money has already been committed to Jackson. What the Department ignores, however, and what the statute realizes, is that, as a result of the Board's decision, the Department's funds have been "credited" the amount they were initially "debited". Thus, at the time of Jackson's appeal from the Board's decision, and despite the Department's position agreeing with Jackson, the Department owed him nothing.[9] Our decision on appeal reverses the Board and "redebits" the Department's accident and/or medical aid funds in Jackson's favor, providing him with "additional relief" within

---

[8]The Department does not dispute that Jackson has met the other statutory requirements for an award of attorney fees.

[9]After the Board's decision denying Jackson coverage, the Department issued an order and notice stating that it no longer owed Jackson any benefits, and demanding that it be repaid the $26,765.91 it had already paid to Jackson.

the meaning of the statute and entitling him to attorney fees on appeal.

Jackson has asked for and is entitled to reasonable attorney fees for work before the superior court and this court. To avoid any unnecessary bifurcation of further proceedings, we instruct Jackson to timely prepare his materials in compliance with RAP 18.1 and to direct those materials to the superior court. The superior court shall then determine the fee to be imposed for the trial in superior court and for the appeal to this court.

Reversed and remanded for such further proceedings as shall be consistent with the decision of this court.

PEKELIS, A.C.J., and GROSSE, J., concur.

Review denied at 124 Wn.2d 1003 (1994).