IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

2014 MAY 27 AM 9: 26
COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

| | | |
|---|---|---|
| COURTNEY ROBINSON, | ) | No. 69739-1-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF LABOR & | ) | PUBLISHED OPINION |
| INDUSTRIES OF THE STATE OF | ) | |
| WASHINGTON, and FOOTBALL | ) | |
| NORTHWEST, LLC, | ) | |
| | ) | |
| Respondents. | ) | FILED: May 27, 2014 |

SCHINDLER, J. — For purposes of the Industrial Insurance Act, Title 51 RCW (IIA),

an employment relationship exists only where (1) the employer has the right to control

the employee's physical conduct in the performance of his duties and (2) there is mutual

consent to an employment relationship. Because substantial evidence supports the

determination that Courtney Robinson was not an employee of the Seattle Seahawks

when he injured his knee during an off-season minicamp tryout as a free agent, we

conclude Robinson was not entitled to workers' compensation benefits under the IIA,

and affirm.

## FACTS

Courtney Robinson attended the University of Massachusetts on a football

scholarship and played defensive back and kick returner. Robinson participated in the

2009 draft but was not selected by any of the 32 National Football League (NFL) teams.

In April 2009, the Philadelphia Eagles entered into negotiations with Robinson, resulting in the execution of an NFL player contract. In August 2009, the Eagles released Robinson from his contract. As a free agent, Robinson could enter into an NFL contract with other teams. In October 2009, Robinson tried out as a free agent with two other NFL teams, the Cincinnati Bengals and the Detroit Lions, but "was not signed" by either team.

In February 2010, sports agent and attorney Lyle Masnikoff began representing Robinson. In an effort to try and get Robinson "an opportunity" to sign an NFL contract, Masnikoff contacted a number of NFL team general managers.

The Seattle Seahawks invited Robinson and 15 other free agents to attend a three-day minicamp tryout from April 13 to 15. On April 7, Masnikoff sent an e-mail to the Seahawks confirming the invitation to try out at the minicamp and describing Robinson's accomplishments. The Seahawks made the travel arrangements for Robinson to fly from Connecticut to Seattle to attend the minicamp.

Seattle Seahawks Vice President of Football Administration John Idzik testified that the Seahawks held three minicamps in 2010. Idzik described a tryout as an opportunity "to bring the player in, meet the player, talk to him, give him a physical exam, . . . run him through the paces and witness his movement firsthand." Idzik said players invited to a tryout are not "required to show up[.] There's nothing mandatory. It's purely voluntary on the part of the player." Idzik testified that prior to signing a player to an NFL contract, the team can "ask them to go through a tryout, through drills.

2

But if the player does not desire to do any of that, he does not have to. We can't mandate it. The only players that we can govern, with mandatory rules and discipline, would be players under contract."

Idzik testified that the NFL rules prohibit the use of pads and contact drills during a minicamp, and the NFL monitors the "tempo" of the minicamps, "such that player safety is always kept in mind." Idzik said drills during a minicamp are "significantly different" than a training camp practice or a game. Idzik testified, in pertinent part:

> So the type of drills that we're able to do in mini-camp versus the type of drills that you're able to do in a full-pads practice during training camp or the type of activities a player goes through on game day in live competition are significantly different.
>
> Q   Okay. And this April 2010 was a mini-camp versus a training camp?
> A   It was a mini-camp, yes.
> Q   Okay. That means nobody was wearing pads?
> A   We were allowed to wear helmets.
> But we were not allowed to wear shoulder pads or any of the customary pads that you see on game day.
> By - by [collective bargaining agreement] rules, they're allowed to wear elbow pads and knee pads and helmets. But they are not allowed to wear anything else. And we're not allowed to have live contact.

Robinson arrived in Seattle on April 12. The Seahawks arranged transportation to the hotel and gave Robinson an itinerary for the three-day minicamp. The itinerary included orientation, meetings, workouts, drills, and meals at the Seahawks practice facility in Renton. NFL rules prohibit teams from compensating tryout players but permit payment of travel and hotel expenses and meals. By contrast, Seahawks players under contract who participate in a minicamp are entitled to a per diem. Idzik testified that the Seahawks players who attended the minicamp received a pro rata portion of either $825 per week if they were a "rookie" or $1,000 per week if they were a veteran player.

3

Idzik said that at the beginning of orientation for a minicamp tryout, the Seahawks go over the "Free Agent Tryout Waiver and Release of Liability" with the free agent players. The Free Agent Tryout Waiver and Release of Liability states that the free agent is "not an employee of the Seattle Seahawks," and the player agrees to release the Seahawks, its employees, as well as the NFL from any liability for injury. Idzik testified, in pertinent part:

> Well, the first thing we do, with all of our tryouts coming to the Seahawks, is make them understand that we - we have them sign a waiver of liability so they understand they're not an employee of the Seahawks, that we're granting them a tryout, that during the tryout they're in essence waiving liability of the Seahawks if anything were to happen to them during the tryout.
> And - you know, and we explain that verbally, too. So we - we give them the form and then run through - run through, you know, the - basically the - what the form says.
> And - and then at that point, if they're willing to go on, which most all of them are, we conduct the interviews, and we conduct the physical examinations and - and eventually the tryout.

Robinson signed the Free Agent Tryout Waiver and Release of Liability on April 12.[1] Later that afternoon, a Seahawks team doctor examined Robinson. After passing the physical examination, Robinson attended a meeting at the practice facility with other

---

[1] The Free Agent Tryout Waiver and Release of Liability states, in pertinent part:

Whereas, Courtney Robinson, (herein known as "Player") who is not an employee of the Seattle Seahawks (herein known as "Club"), has a desire to participate in various . exercises and workouts at the Seattle Seahawks' training facility, including but not limited to participation in workout and/or mini-camp sessions from 4/13/10 through 4/15/10 and;

Whereas Player fully understands the risks involved in that it is possible to sustain serious injury during the course of said exercises and workouts, and;

Now, therefore, in consideration of the opportunity to participate in the aforementioned exercises and workouts, Player fully covenants not to sue and forever discharges the Seattle Seahawks, its officers, coaches, scouts, athletic trainers, physicians, players, and employees as well as the National Football League (herein known as "Releasees") from any and all liability to the Player, his personal representative assigns, heirs, and next of kin from any and all loss or damage, or claim or demands therefore on account of injury to the person or property or resulting in the death of the Player, whether caused by negligence of Releasees or otherwise.

free agents, players under contract, and the coaches. Afterwards, Robinson met with Seahawks defensive coordinator Paul Bradley.

The next day, Robinson returned to the Seahawks facility for breakfast followed by a meeting with other free agents, players under contract, and the coaches.

The coaches conducted on-field drills after lunch. Seahawks Head Coach Pete Carroll lined up the defensive back players. Robinson testified that after signaling to him "to go," Coach Carroll threw him the ball. Robinson testified that while he "was back peddling, my foot got caught in the ground, or whatnot, but as I dove for the ball I was injured, you know, on that current play." Robinson said he "knew something was wrong because the knee started . . . swelling up." The team trainer examined Robinson and told him "it wasn't a torn ACL [(anterior cruciate ligament)], but torn meniscus." Robinson got ice for his knee and went to a meeting for defensive backs, followed by dinner at the training facility. During dinner, a Seahawks employee told Robinson he was booked on a return flight home that night.

On June 7, Robinson filed an application for benefits with the State of Washington Department of Labor and Industries (Department). Robinson asserted that on April 13 he sustained an industrial injury during the course of employment with the Seahawks. The Department denied the claim. Robinson filed an appeal with the State of Washington Board of Industrial Insurance Appeals (BIIA).

Robinson, his sport agent Masnikoff, and Seahawks defensive coordinator Bradley testified during the two-day hearing before the Board of Industrial Insurance Appeals judge (IAJ). The IAJ also admitted into evidence the deposition testimony of Seahawks Vice President of Football Administration John Idzik, the Free Agent Tryout

5

Waiver and Release of Liability Robinson signed, and a standard NFL player contract. The parties stipulated that the Seahawks paid Robinson's travel expenses in the amount of $1,124.80 for airfare, and hotel expenses for two nights at the Sheraton Hotel in the amount of $180.76.

Robinson testified that the invitation to attend the Seahawks minicamp was an opportunity to "show [his] skills to the Seahawks" and "reestablish" himself. Robinson said that he was "hoping to sign [a] contract at the end of the mini camp." Robinson testified that playing as a defensive back and kick returner "is very problematic to injuries."

Sports agent Masnikoff testified that Robinson was a free agent when he attended the minicamp, that NFL player contracts must be in writing, and that Robinson did not have a written contract with the Seahawks. Masnikoff admitted that free agent players invited to a minicamp tryout are not "guaranteed a position with the team," and the percentage of players offered a contract is well below 50 percent.

Seahawks defensive coordinator Paul Bradley testified that he did not have the authority to sign free agent players to the team. Bradley said that he makes a point of telling free agent tryout players that there are "no guarantees but . . . you have a chance to come in and compete . . . . You have a chance to show your skills and talents, and what you have." Bradley testified that the Seahawks did not have a special or "out of the ordinary" need for a defensive back in 2010.

Idzik testified that his responsibilities included drafting contracts and signing players. Idzik said that when the Seahawks invite a free agent player to a tryout, the

free agent and his representation are informed that there is no guarantee the player will be offered a contract at the end of the tryout:

> We bring - and also I should say that it's - it's discussed with their representation, when you're setting up the tryout, so that they know - the player knows that we're bringing him in to acquaint ourselves with him, to try him out; and at the end, we'll make our evaluation. And at that time, we'll decide whether or not to offer a contract.

Idzik said that when the team extends an offer, it must to use the standard written "National Football League Player Contract." Idzik testified there are "literally thousands" of highly qualified players in the pool of noncontract players the Seahawks are able to recruit and sign. Idzik said that in 2010, the Seahawks had approximately 100 "tryouts and visits."[2] Of the 69 "tryout" players the team was required to report to the NFL, the Seahawks signed 13 players "immediately after the tryout" and 9 others "at some subsequent date." Idzik testified that of the 16 free agents who attended the minicamp tryout in April 2010, the Seahawks signed an NFL player contract with 5 players but only 2 of the 5 players made the final team roster. Under NFL rules, the Seahawks can have a maximum of 80 contract players during the offseason but only 53 contract players on the roster for the regular season.

The IAJ issued a proposed decision and order. The IAJ concluded that because Robinson was not an employee of the Seahawks when he was injured during the minicamp tryout, he was not entitled to benefits under the IIA.

The IAJ found Robinson's participation in the minicamp tryout was voluntary, Robinson "did not receive any value from his attendance at the mini-camp," and the Seahawks did not pay Robinson "any form of wage or other compensation." The IAJ

---

[2] Idzik explained that "[a] visit would be bringing someone in. You may conduct a physical exam, an interview, and not do any on-field work."

7

also found that "the mini-camp was not merely a training he had to undergo to be qualified for the position." Rather, Robinson, like "everyone else at the mini-camp, . . . hoped he would be selected by the Seahawks." The proposed decision and order states, in pertinent part:

> There is no question that the Seahawks dictate the schedule to be followed for the mini-camp; however, Mr. Robinson's participation was completely voluntary and did not provide any benefit to the team. Mr. Robinson was not paid any form of wage or other compensation. Further, just as with everyone else at the mini-camp, Mr. Robinson hoped he would be selected by the Seahawks. However, the mini-camp was not merely a training he had to undergo to be qualified for the position. Finally, Mr. Robinson did not receive any value from his attendance at the mini-camp. He did not learn any new skill that could be transferred to another team, or benefit him independent of the Seahawks.

The BIIA denied Robinson's petition for review and adopted the proposed decision and order as its final order.

Robinson filed an appeal of the BIIA final order in superior court. The superior court concluded Robinson was not an employee for purposes of the IIA when he was injured during the minicamp tryout. The superior court entered extensive "Findings of Fact and Conclusions of Law" affirming the decision of the BIIA.

## ANALYSIS

Robinson contends the court erred in concluding he was not an employee of the Seattle Seahawks for purposes of the IIA when he was injured during the minicamp tryout.

## Standard of Review

The superior court acts in an appellate capacity in an appeal from the BIIA decision and reviews the decision de novo. Ruse v. Dep't of Labor & Indus., 138 Wn.2d

1, 5-6, 977 P.2d 570 (1999). The BIIA decision is prima facie correct, and the burden of proof is on the party attacking the decision. RCW 51.52.115;[3] Ruse, 138 Wn.2d at 5.

Our review of the superior court's decision is governed by RCW 51.52.140. RCW 51.52.140 states that an "[a]ppeal shall lie from the judgment of the superior court as in other civil cases." Accordingly, the statutory scheme results in a different role for this court than is typical for appeals from administrative decisions. Rogers v. Dep't of Labor & Indus., 151 Wn. App. 174, 180, 210 P.3d 355 (2009). We review only " 'whether substantial evidence supports the trial court's factual findings and then review, de novo, whether the trial court's conclusions of law flow from the findings.' " Rogers, 151 Wn. App. at 180 (quoting Watson v. Dep't of Labor & Indus., 133 Wn. App. 903, 909, 138 P.3d 177 (2006) (citing Ruse, 138 Wn.2d at 5)). We must review the record in the light most favorable to the party who prevailed in superior court. Harrison Mem'l Hosp. v. Gagnon, 110 Wn. App. 475, 485, 40 P.3d 1221 (2002). We do not weigh or balance the competing testimony and inferences, or apply anew the burden of persuasion. Gagnon, 110 Wn. App. at 485. Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the matter asserted. Ferencak v. Dep't of Labor & Indus., 142 Wn. App. 713, 719-20, 175 P.3d 1109 (2008).

---

[3] RCW 51.52.115 states, in pertinent part:
The hearing in the superior court shall be de novo, but the court shall not receive evidence or testimony other than, or in addition to, that offered before the board or included in the record filed by the board in the superior court as provided in RCW 51.52.110 . . . . In all court proceedings under or pursuant to this title the findings and decision of the board shall be prima facie correct and the burden of proof shall be upon the party attacking the same. If the court shall determine that the board has acted within its power and has correctly construed the law and found the facts, the decision of the board shall be confirmed.

Employment Relationship under the IIA

The right to workers' compensation is statutory. <u>Ochoa v. Dep't of Labor &</u> <u>Indus.</u>, 143 Wn.2d 422, 425, 20 P.3d 939 (2001). The IIA was designed to provide "sure and certain relief" to injured workers while limiting employer liability for industrial injuries. RCW 51.04.010; <u>Dennis v. Dep't of Labor & Indus.</u>, 109 Wn.2d 467, 469-70, 745 P.2d 1295 (1987). When first enacted, the IIA provided relief only to workers injured while preforming "extra hazardous work." LAWS OF 1911, ch. 74, §§ 1-2. In 1971, the legislature amended the IIA to cover "all employments . . . within the legislative jurisdiction of the state." LAWS OF 1971, 1st Ex. Sess., ch. 289, § 1.

A workers' compensation claimant bears the burden of establishing eligibility for benefits. <u>Ehman v. Dep't of Labor & Indus.</u>, 33 Wn.2d 584, 595, 206 P.2d 787 (1949); <u>Jenkins v. Dep't of Labor & Indus.</u>, 85 Wn. App. 7, 14, 931 P.2d 907 (1996). In order to receive workers' compensation benefits pursuant to the IIA, the claimant must prove he is a "worker injured in the course of his or her employment." RCW 51.32.010; <u>Ackley-</u> <u>Bell v. Seattle Sch. Dist. No. 1</u>, 87 Wn. App. 158, 165, 940 P.2d 685 (1997). "Worker" is defined as "every person in this state who is engaged in the employment of an employer under this title, whether by way of manual labor or otherwise in the course of his or her employment." RCW 51.08.180; <u>Ackley-Bell</u>, 87 Wn. App. at 165. Under RCW 51.08.013(1), an individual is "acting in the course of employment" when their actions are at the employer's direction or in the furtherance of the employer's business. Therefore, a workers' compensation claimant must prove the existence of an employment relationship in order to establish the claimant is entitled to benefits.

10

Although we liberally construe the IIA "in favor of persons who come within the act's terms," the IIA liberal construction "does not apply to defining who those persons might be." Berry v. Dep't of Labor & Indus., 45 Wn. App. 883, 884, 729 P.2d 63 (1986). Instead, persons who claim rights under the IIA are held "to strict proof of their right to receive the benefits provided by the act." Olympia Brewing Co. v. Dep't of Labor & Indus., 34 Wn.2d 498, 505, 208 P.2d 1181 (1949), overruled on other grounds by Windust v. Dep't of Labor & Indus., 52 Wn.2d 33, 323 P.2d 241 (1958).

In Clausen v. Department of Labor & Industries, 15 Wn.2d 62, 69, 129 P.2d 777 (1942), the Washington Supreme Court held common law rules apply to determine whether an employment relationship exists, but "[i]t is impossible to lay down a rule by which the status of a person performing a service for another can be definitely fixed as an employee. Ordinarily no single feature of the relation is determinative, but all must be considered together." Clausen, 15 Wn.2d at 69 (citing 1 W. SCHNEIDER, WORKMEN'S COMPENSATION TEXT § 220, at 575 (Perm. Ed. 1941)). Nonetheless, the court identified factors to consider, such as "the right of control and discharge, payment of wages, and the contractual relationship, whether express or implied." Clausen, 15 Wn.2d at 69 (citing 1 SCHNEIDER, WORKMEN'S COMPENSATION TEXT, at 575).

In Novenson v. Spokane Culvert & Fabricating Co., 91 Wn.2d 550, 588 P.2d 1174 (1979), the Washington State Supreme Court adopted a two-prong test for determining whether an employee-employer relationship exists for purposes of the IIA. The court held that "[f]or purposes of workmen's compensation, an employment relationship exists only when: (1) the employer has the right to control the servant's physical conduct in the performance of his duties, and (2) there is consent by the

11

employee to this relationship." Novenson, 91 Wn.2d at 553. The court clarified that unlike the common law, "[t]he right of control is not the single determinative factor." Novenson, 91 Wn.2d at 553. Rather, a "mutual agreement must exist between the employee and employer to establish an employee-employer relationship." Novenson, 91 Wn.2d at 553. Whether the two-prong test of Novenson is proved is a question of fact. Smick v. Burnup & Sims, 35 Wn. App. 276, 279, 666 P.2d 926 (1983).

Robinson concedes he did not have an express contractual agreement with the Seahawks. Robinson claims the high degree of control the Seahawks exercised over him during the minicamp tryout and payment of his travel expenses, hotel expenses, and meals establishes an implied employment agreement. Robinson asserts the facts are strikingly similar to the facts in BIIA significant decision In re Kimberly J. Bemis, No. 90 5522, 1992 WL 160668, at *1 (Wash. Bd. of Indus. Ins. Appeals May 1, 1992). We disagree.[4]

In Bemis, the BIIA considered whether the claimant Kimberly J. Bemis was an employee of Alaska Airlines and, if so, whether she suffered an industrial injury during the course of employment. Bemis, 1992 WL 160668, at *1.

Bemis was injured during a five-week flight attendant training program conducted by Alaska Airlines. Bemis, 1992 WL 160668, at *2. Federal regulations require flight attendants on commercial flights to be Federal Aviation Administration (FAA) certified. Bemis, 1992 WL 160668, at *7. Alaska Airlines designed the five-week training program to satisfy the requirements of the FAA for certification of flight attendants and

---

[4] While decisions of the BIIA are not binding on this court, we accord substantial weight to the Department's interpretation of regulations within its area of expertise. Postema v. Pollution Control Hearings Bd., 142 Wn.2d 68, 77, 11 P.3d 726 (2000).

to meet specific company needs. Bemis, 1992 WL 160668, at *8. Alaska Airlines assumed the cost of the training. In addition, each participant received an $8 per diem. Bemis, 1992 WL 160668, at *2.

Attendance during the 8-hour-a-day training program was mandatory and "[a]bsence from any portion of the training disqualified a trainee from completing the course." Bemis, 1992 WL 160668, at *5, *2. Alaska Airlines had the right to discharge trainees and preclude future employment with Alaska Airlines. Bemis, 1992 WL 160668, at *5. But successful completion of the training program guaranteed future employment with Alaska Airlines. Bemis, 1992 WL 160668, at *5.

The BIIA concluded that the guarantee of a job "upon successful completion of the training course" and "the control the airline exercised over the trainees' attendance at the training program, the right to discharge them from the course at any time, and the consideration paid to the trainees in the form of per diem and free training," created "an implied contract of employment at the onset of training." Bemis, No. 1992 WL 160668, at *6.

Unlike in Bemis, the findings do not support the existence of an implied contract of employment between Robinson and the Seahawks. First, substantial evidence supports the findings that show the Seahawks did not have the "right to control" Robinson's "physical conduct in the performance of his duties." Novenson, 91 Wn.2d at 553. The superior court's Findings of Fact state, in pertinent part:

> 5. The purpose of the mini-camp was for the Seahawks to see Mr. Robinson and fifteen others perform before proceeding with any offer of employment; the mini-camp also gave Mr. Robinson and others an opportunity to meet Seahawks personnel and view Seahawks procedures before considering whether they wished to be employed with the Seahawks.

. . . .

> 7. Mr. Robinson accepted the invitation to the Seahawks mini-camp with the understanding and knowledge that his participation was voluntary and he could have gone home anytime, as he did not have a contract with the Seahawks.

The record makes clear that participation in the minicamp was voluntary and the on-field drills at the minicamp were "significantly different" from preseason training or a game. Unlike in Bemis, the Seahawks did not control Robinson's conduct during the minicamp tryout, and Robinson did not attend the minicamp tryout to learn new skills. Attendance at the three-day minicamp was solely for the purpose of giving Robinson and the other free agents the opportunity to try out. As Robinson acknowledged, the minicamp was an opportunity for him to "show [his] skills" and "reestablish" himself in the hopes that the Seahawks would offer him a contract. Robinson also admits he did not "come to Seattle to learn how to play football." Further, the record also establishes successful completion of the minicamp tryout did not guarantee employment with the Seahawks.

While the Seahawks provided Robinson with an itinerary to follow during the minicamp, substantial evidence shows the Seahawks did not have the authority to discharge or discipline Robinson for either not following the itinerary or not participating in the scheduled activities. By contrast, Seahawks players under contract are subject to "mandatory rules and discipline."[5]

---

[5] For the first time in his reply brief, Robinson cites Bolin v. Kitsap County, 114 Wn.2d 70, 785 P.2d 805 (1990), to argue the Seahawks' right to control establishes an employment relationship. Bolin is distinguishable. In Bolin, because a juror's "entire service was involuntary," the court held that the Novenson two-prong test did not apply. Bolin, 114 Wn.2d at 73-77.

Second, substantial evidence supports the determination that there was no mutual agreement to an employment relationship between Robinson and the Seahawks, and no objective evidence supports the reasonable belief that Robinson was an employee. Although an employee's subjective belief as to the existence of an employer-employee relationship is material, "[a] worker's bare assertion of belief that he or she worked for this or that employer does not establish an employment relationship." Rideau v. Cort Furniture Rental, 110 Wn. App 301, 307, 39 P.3d 1006 (2002); Jackson v. Harvey, 72 Wn. App. 507, 519, 864 P.2d 975 (1994). The court must determine whether the claimant's belief is objectively reasonable. Jackson, 72 Wn. App. at 519.

The court's Findings of Fact state, in pertinent part:

8. Mr. Robinson tried out for at least two other teams before the Seahawks mini-camp but had not been offered employment.
9. On April 30, 2009, a year before the Seahawks mini-camp, Mr. Robinson had tried out for the Philadelphia Eagles, an offer of employment had been made, the parties had negotiated the particulars of employment and ultimately the parties had executed a standard National Football League player contract form which created an employment relationship and contained the particulars thereof.
10. Prior to attendance at the Seahawks mini-camp in April, 2010, Mr. Robinson knew that attendance at such mini-camp did not create an employment relationship between prospective players such as himself and National Football League teams.
11. Prior to attendance at the Seahawks mini-camp in April, 2010, Mr. Robinson knew that the National Football League and the Seahawks had well established and formalized employment procedures in place, and that pursuant to such procedures, an employment relationship was not created between prospective players and teams until an offer of employment was made, complete employment particulars were negotiated and agreed, and both the prospective player and the team had executed a standard National Football League player contract form creating an employment relationship and containing the particulars thereof.
. . . .
21. Of the sixteen persons (including Mr. Robinson) who attended the Seahawks mini-camp in April, 2010, five were approached with employment offers from the Seahawks which led to execution of a

15

standard National Football League player contract and creation of employment relationships between the Seahawks and those players; Mr. Robinson was not one of those five players.

The Seahawks expressly informed Robinson and his agent that attendance at the minicamp did not guarantee a place on the team or create an employment relationship. At orientation, the Seahawks reiterated that attending the minicamp tryout did not mean Robinson was "an employee of the Seahawks." Further, substantial evidence shows that the successful completion of a minicamp tryout did not guarantee future employment with the Seahawks. Of the 16 tryout players at the minicamp Robinson attended, only 5 were offered contracts, and only 2 eventually made the final 53-man roster.

Substantial evidence supports the finding that Robinson knew an employment relationship with an NFL team did not exist unless the team made an offer and the parties executed a standard NFL player contract form. There is no dispute Robinson signed a contract with the Philadelphia Eagles NFL team in 2009 before becoming a free agent, and he previously attended a tryout with two other NFL teams that did not offer him a contract.

Robinson also argues that payment for transportation, lodging, and meals constitutes "wages" under RCW 51.08.178. Cockle v. Department of Labor & Industries, 142 Wn.2d 801, 16 P.3d 583 (2001), does not support his argument. Cockle addresses whether the value of employer-provided health care coverage should be included in the calculation of compensation payments under RCW 51.08.178. Cockle, 142 Wn.2d at 805.

RCW 51.08.178(1)(g) states that " 'wages' shall include the reasonable value of board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire." Because RCW 51.08.178 wage calculation applies to workers covered by the IIA, the statute is "not applicable to the facts in this case."[6]

Here, unlike in Bemis where the claimant received the value of a training course in addition to a per diem, the Seahawks did not pay Robinson wages or a per diem, and Robinson concedes he "did not gain any benefit or value by . . . participating in the tryout during the mini-camp." Substantial evidence supports the conclusion that the statute defining "wages," RCW 51.08.178, "is not applicable to the facts of this case."[7]

Relying heavily on the decision in Bemis, Robinson asserts that in determining whether an employment relationship exists, we should consider the exposure to risk and whether the activity provides a benefit to the employer. Bemis does not support his argument.

The BIIA in Bemis did not rely on exposure to risk or benefit to the employer to determine whether there was an employment relationship. In Bemis, the BIIA considered two separate issues. First, whether the claimant was an employee and second, whether the claimant suffered an industrial injury during the course of employment. Bemis, 1992 WL 160668, at *1. After concluding Bemis established an implied contract of employment with Alaska Airlines based on the guarantee of employment, the high degree of control, including the right to discharge, and the

---

[6] Further, reimbursement for incidental expenses like travel and food is not sufficient to transform that individual into an employee for purposes of the IIA. See Doty v. Town of S. Prairie, 155 Wn.2d 527, 542-45, 120 P.3d 941 (2005) (holding the stipend paid to volunteer firefighters constituted reimbursement for expenses incurred in performing assigned duties and did not render a volunteer an employee under the IIA).

[7] Finding of Fact 16 states, "The Seahawks did not pay Mr. Robinson wages or per diem, but they paid for his air-fare, transportation, lodging and provided him food while at the tryout during the mini-camp." Conclusions of Law 5 states, "RCW 51.08.178 is not applicable to the facts in this case."

payment of a per diem, the BIIA then addressed whether Bemis met her burden of proving the injury occurred "in the course of her employment." Bemis, 1992 WL 160668, at *5-6. The BIIA cites the undisputed evidence that Bemis "undertook flight attendant training at the direction of Alaska Airlines" to conclude the injury occurred during the course of employment. Bemis, 1992 WL 160668, at *6. As further support for the conclusion that the injury occurred in the course of employment, the BIIA cites two out-of-state cases addressing "the question of workers injured during 'tryout' periods," Smith v. Venezian Lamp Co., 168 N.Y.S.2d 764 (N.Y. App. Div. 1957), and Laeng v. Workmen's Compensation Appeals Board, 494 P.2d 1 (Cal. 1972), noting that those cases consider the risks to which the applicant was exposed and the benefit to the employer to determine whether an "injury to a worker who is being trained but has not yet begun performing the full duties of the intended job" is covered. Bemis, 1992 WL 160668, at *6-7.[8]

Alternatively, Robinson urges us to adopt an exception to the requirement in Novenson that the claimant must establish a mutual agreement to an employment relationship for a minicamp tryout. We cannot ignore the well-established and binding

---

[8] In Smith, the claimant applied for a job as a lamp polisher. Neither wages nor hours were discussed but a manager said that "he would try him out." Smith, 168 N.Y.S.2d at 765-66. The claimant was injured while polishing a lamp. After the accident, the employer admitted "that it was the employer, that claimant was employed as a polisher, and that claimant was being given a trial to test experience to establish base pay." Smith, 168 N.Y.S.2d at 765-66. The court held that where the undisputed facts show "a tryout involves an operation that would be ordinarily viewed as hazardous," under New York law, an employment relationship exists. Smith, 168 N.Y.S.2d at 766.

In Laeng, the claimant was injured during a physical agility test that was part of a tryout for the position of refuse crew worker with the city. Laeng, 494 P.2d at 2. Under California law, "employee" is defined as " 'every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written.' " Laeng, 494 P.2d at 4 (quoting CAL. LABOR CODE, § 3351). " 'Any person rendering service for another, other than as an independent contractor, or unless expressly excluded herein, is presumed to be an employee.' " Laeng, 494 P.2d at 4 (quoting CAL. LABOR CODE, § 3357). The court concluded that the claimant was entitled to workers' compensation because his injury was incurred in the performance of a "potentially hazardous" task in the service of, and for the benefit of, the employer. Laeng, 494 P.2d at 9.

18

Washington Supreme Court precedent that requires a claimant to establish mutual consent to an employment relationship for purposes of the IIA. 1000 Virginia Ltd. P'ship v. Vertecs Corp., 158 Wn.2d 566, 578, 146 P.3d 423 (2006).

Because substantial evidence supports the superior court findings and those findings support the conclusion that Robinson was not an employee of the Seahawks for purposes of the IIA, we affirm denial of workers' compensation benefits.

WE CONCUR: